[No. C030858. Third Dist. May 23, 2000.]

SACRAMENTO CHILDREN'S HOME, Plaintiff and Appellant, v. STATE DEPARTMENT OF SOCIAL SERVICES et al., Defendants and Respondents.

**COUNSEL**

Washburn, Briscoe & McCarthy and James P. Corn for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Frank S. Furtek and Roy S. Liebman, Deputy Attorneys General, for Defendants and Respondents.

**OPINION**

**DAVIS, Acting P. J.**—After an adverse administrative adjudication, plaintiff Sacramento Children's Home (SCH) petitioned for a writ of mandate directing defendant State Department of Social Services (DSS) to set aside its decision that plaintiff SCH was liable for overpayments during the 1991-1992 fiscal year. The superior court denied the writ. On appeal, plaintiff SCH contends it cannot be compelled to repay money it did not receive, defendant DSS abused its discretion in calculating the amount of overpayments under its governing regulations and statutes, and DSS regulations are not consistent with their authorizing legislation. We shall affirm.

As plaintiff SCH concedes in its brief, it does not challenge the accuracy of the defendant's computations. Rather, it challenges the underlying methodological theories on which the calculations are based, raising purely legal

issues. As a consequence, we need relate little if any of the evidence in the administrative record. Such facts as are pertinent will be incorporated in the Discussion where relevant.

## DISCUSSION

### I. *Background*

#### A. *Legal*

"A group home program shall be initially classified, for purposes of emergency regulations, according to the level of care and services to be provided using a point system developed by [DSS] and described in the report . . . prepared by the [DSS], August 30, 1989." (Welf. & Inst. Code, § 11462, subd. (b) [undesignated section references are to this code].)[1] Based on the number of points, the program is classified in one of 14 ranges known as rate classification levels (RCL's), with RCL 14 compensated at the highest rate. (*Id.*, subd. (f).) The defendant determines the RCL for a group home program on a prospective basis for the fiscal year. (*Id.*, subd. (e).)

Under the 1989 report's methodology, a group home vendor applies for compensation for a program by adding together the projected number of staff hours per child for the coming fiscal year in each of three categories of services (child care, social work, and mental health). (MPP §§ 402.211, 402.212, 402.213, 402.237, 402.331.)[2] These staff hours are multiplied by factors representing the education and experience of the various employees providing the services, with the general effect of child-care hours having the lowest weight and mental-health hours the greatest. (MPP §§ 402.221, subd. (b), 402.222, subd. (a), 402.223, subd. (a), 402.231.) The resulting weighted staff hours in each category are then divided by 90 percent of the program's licensed capacity. (MPP §§ 402.232, 402.233.) The sum of the three components is the point total for the program, which determines the RCL according to the statutory categories. (MPP §§ 402.235, 402.236.) The RCL is thus a measure of a projected *staffing level* providing a particular mix of services, without regard to the actual number of clients in the program.

---

[1] Although the plaintiff's briefing frequently suggests the point system which the defendant employs improperly uses a vendor's capacity as a measure of staffing levels, it concedes this methodology is based on the 1989 report, which the statute expressly authorizes. We thus will not address the matter further.

[2] Section 10554 authorizes the defendant to print certain of its regulations in its publications rather than in the California Code of Regulations. Pertinent to this appeal is division 11 of the defendant's manual of policies and procedures (which appears in manuscript as an exhibit in the administrative record). In citing to the sections of division 11, we will thus give them the prefix "MPP."

A vendor ordinarily must determine its RCL annually. However, the vendor may apply during the course of the year for a program change (which includes, inter alia, an increase in the RCL). (MPP §§ 400, subd. (p)(6), 402.430 et seq.)

As might be expected, the defendant audits vendor records, comparing their reports of the actual services each vendor provided over the course of the fiscal year with the projected RCL. (MPP §§ 402.510, 402.531.) The defendant averages the actual RCL points over the course of the audit period and compares this with the lowest end of the range of points for the projected RCL. (If there has been a program change based on a change in the RCL, each RCL is a separate audit period.) If the actual points fall short, this is called a "failure to maintain" and results in an overpayment to the vendor. There is a sliding scale of liability for overpayment. A shortage of up to 5 points incurs liability of $100 per actual client; a shortage of 6 to 10 points incurs a liability of $200 per actual client; and anything greater incurs a liability of the full difference between the RCL rate at which the defendant compensated the vendor per actual client and the compensation level that the vendor's actual RCL warrants. (MPP §§ 402.532, subd. (a)(1), 402.625, 402.643.)

In 1993, the Legislature directed the defendant to provide for an exception to liability for overpayment where "the level of care and services provided per child . . . equals or exceeds the level associated with the program's RCL." However, the defendant is to focus solely on whether the vendor provided "services *other than* child care [i.e., hours of social work and mental-health services] . . . in an amount that is at least proportionate on a per child basis to the amount projected in the . . . application" (italics added), and where these other services fall short of a proportionate level, child-care hours may not make up the shortfall. (§ 11466.2, subd. (b)(2).) The defendant promulgated regulations putting these legislative directives into effect. (MPP §§ 402.562-402.565.)[3]

### B.   *Procedural*[4]

During fiscal year 1991-1992, the plaintiff initially applied for compensation for a program at RCL 9, requiring a minimum point total of 270. During the course of the year, it filed a program change, proposing to operate at RCL 11 effective February 1, 1992, which requires a minimum point total of 330.

---

[3]These regulations are not in the manuscript exhibit. However, the defendant has stipulated the quotations in the plaintiff's brief on appeal are accurate.

[4]We draw the procedural facts in part from the August 1997 decision of the defendant's deputy director, since there is no suggestion in the parties' briefs that it is inaccurate in this respect.

In February 1993, the defendant audited the plaintiff's 1991-1992 program. Pursuant to its regulations, it separately audited the different RCL's. The audit verified the plaintiff's program operated at the proposed RCL 9 level through January 30, 1992. However, the audit concluded the program averaged only 304.95 points from February through June 1992 (coming within the 300-329 point range for RCL 10 rather than the proposed RCL 11 rate), resulting in an overpayment of the full difference between the two RCL's.

The plaintiff filed a protest in May 1993. The defendant modified its calculation of the program's average actual occupancy and otherwise sustained the audit. Following hearings in July 1995 and January 1996, the defendant's hearing officer issued a proposed decision which sustained the plaintiff's arguments regarding the defendant's improper implementation of the statutory "proportionality" exception to overpayment liability, and otherwise denied the administrative appeal. The defendant declined to adopt the decision and issued a decision denying the appeal in whole.

In ruling on the plaintiff's petition, the court denied most of the arguments at the hearing; in a written ruling, it rejected a remaining issue (in which the plaintiff argued the proportionality of its program to RCL 11 must be determined over a 12-month period rather than only the last five months of fiscal 1991-1992). The court did not consider any evidence outside the administrative record.

## II.

The plaintiff's first argument is the most curious. It contends it cannot be compelled to repay money it never received. The gist of this argument is the use of 90 percent of licensed capacity as a measure of the level of services rather than the actual census. Conflating the measure of staffing levels—which rests on the imputed 90 percent occupancy level—with the actual census, the plaintiff concludes it is being "required to repay monies it never received" because its census was below the imputed level. From this misguided premise, the plaintiff suggests there is a violation of federal law (the particulars of which argument we will not relate as its foundation is absent).

In no sense is the plaintiff paying back money it "never received." The defendant compensated the plaintiff *per actual client* for a particular staffing level. Upon discovering the plaintiff did not maintain this staffing level, the defendant sought reimbursement of the excess *per actual client*. The RCL presumes there is sufficient staffing to provide sufficient services at that

level for 90 percent of a vendor's capacity. The audit determines whether this in fact was the case. The actual number of clients is irrelevant to this determination of staffing levels and concomitant compensation levels.

Thus, it is not the plaintiff's lowered census which results in the overpayment; after all, the plaintiff could have maintained a level of staffing sufficient to provide RCL 11 services for 90 percent of its capacity even when fewer clients were present. If, as we assume, this was an infeasible decision in light of a comparison of the personnel costs and the compensation per client, when confronted with the lowered census the plaintiff should have reported its incipient failure to maintain to the defendant, who would then have readjusted the RCL and eliminated an extended liability for overpayments. (§ 11462, subd. (e)(2); MPP § 402.441 et seq.)[5] We thus do not find any "error of law" resulting in a "miscarriage of justice" to the plaintiff.

## III.

■ Plaintiff SCH argues defendant DDS committed an abuse of discretion by failing to follow its own regulations for audits. The plaintiff concedes the defendant's regulations provide that where there has been a program change, "the months of each RCL shall be audited separately as a separate audit period." (MPP § 402.532, subd. (a)(1).) However, it claims that in the regulations governing the computation of overpayments, the defendant must average "the actual number of points per month for the *total audit period*" (italics added) and compare this with the lowest point total for the "projected average RCL." (*Id.*, § 402.643, subds. (a) & (b).) The plaintiff interprets these latter regulations as requiring the defendant to average the separate RCL 9 and RCL 11 audit results over the entire 12 months, which would result in a hybrid projected point total of 295 and a hybrid actual point total of 296.25. It suggests that we must interpret the "total" audit period and the "projected average RCL" as covering 12 months, because the application for compensation projects the RCL as an average over 12 months (as does the application for a program change). (MPP §§ 402.237, 402.432.) Lurking in its argument seems to be the assertion that otherwise a vendor who submits a program change loses the benefit of having a full 12 months to compensate for any early shortfalls in staffing levels.

This is *not* a matter in which we review an agency's interpretation of its authorizing statutes (which is respectful but ultimately de novo, *CJS Co. v.*

[5]The plaintiff contradicts neither this suggestion in the defendant's brief, nor the suggestion (for which the defendant provides no citation to statute or regulation) that the plaintiff could also have applied for a reduction in its licensed capacity.

*Workers' Comp. Appeals Bd.* (1999) 74 Cal.App.4th 294, 296, fn. 1 [88 Cal.Rptr.2d 109]). Rather, the manner in which defendant DSS conducts audits is a matter squarely within its expertise, and we thus defer to its regulations and its interpretations of them, so long as they are reasonable. (See *Henning v. Division of Occupational Saf. & Health* (1990) 219 Cal.App.3d 747, 758-759 [268 Cal.Rptr. 476].)

It is reasonable for DSS to provide specifically that a fiscal year during which a program changes its RCL should have separate audit periods for each RCL. Only in this manner can the defendant determine whether the compensation a vendor receives for a particular projected discrete level of staffing matches the program it actually provides. The plaintiff's proposed method creates numbers with no meaning which fortuitously allow it to argue that over the course of a year it provided more average services than projected. There is no statutory basis for averaging discrete RCL's to generate a "9+/10-" staffing level against which to compare the plaintiff's performance. It renders the regulation for separate audit periods meaningless if the two periods themselves are averaged. In any event, this exercise profits the plaintiff nothing in terms of overpayments: its provision of services above a projected 9+/10- level is still lower than the RCL 11 level for which it was *compensated.*

It is also reasonable for the defendant to harmonize its regulations as it has. It is required merely to determine averages over the course of a total audit period, not a period of any particular length. The defendant is entitled to keep its audits generally aligned with the Legislature's budgeting process without adjusting for the idiosyncratic projections of the programs of its vendors. It is not a valid riposte that a vendor ought to have a full 12 months in which to reach the average RCL on which its compensation is based. The vendor simply can delay putting an increase in its RCL into effect until the start of the new fiscal year.

In short, we do not find any abuse of discretion on the part of the defendant in segregating the 1991-1992 fiscal year into RCL 9 and RCL 11 components. Nor is there an abuse of discretion in measuring audit periods of fewer than 12 months.

## IV.

As noted earlier, the Legislature has provided for a "safe harbor" for vendors for whom low occupancy results in a failure to maintain a projected

RCL. So long as each actual client receives actual services other than child care at the same proportion as its projected RCL, there is no liability for an overpayment. (§ 11466.2, subd. (b)(2).) The statute expressly forbids using any excess in child-care services to substitute for deficits in the other, more remedial, services.

In the regulations putting this safe harbor provision into effect, defendant DSS requires that "program hours for social work activities and mental health treatment services provided to children in placement shall be provided on a proportional per child basis to the amount originally projected." (MPP § 402.562, subd. (b).) In addition, "[i]n order to qualify for an audit adjustment, a group home provider shall provide, at a minimum, the [projected] level of care and services . . . per child per month, for children actually in placement, in each of the service components of child care and supervision, social work activities, and mental health treatment services." (MPP § 402.565, subd. (d).)

In its application for the program change to RCL 11, the plaintiff projected point totals of 266.94 for child care, 67.33 for social-work activities and 6.42 for mental-health activities. The defendant's audit of the RCL 11 period revealed respective actual point totals of 252.13, 43.79 and 9.03. After DSS applied its proportionality calculations (which the plaintiff concedes are accurate) to these raw figures, the plaintiff had an excess in the child-care and mental-health hours above the adjusted minimum for RCL 11, but still had a substantial deficit in the social work category that exceeded the excess in mental health hours.

Plaintiff SCH argues the statute expressly describes the proportionality of social-work and mental-health services in the *aggregate*. Therefore, the defendant's regulations cannot consider proportionality of the two categories *individually*.[6]

The defendant's decision declined to reach the issue because the deficit in the combined categories meant plaintiff SCH could not demonstrate it was disadvantaged by the regulation. We agree; since the issue is not determinative to this opinion, resolving it would be no more than dictum.

---

[6]The plaintiff reiterates under this heading its claim the defendant must use a 12-month period over which to average the calculations. As there is still no basis for this proposition in statute, regulation, or logic, we consider it no further.

SCH also argues the regulations cannot require proportionality of child-care services because there is no basis in the statute for such a mandate. Both the excess in its child-care services and its deficit in social-work services make it unnecessary for us to consider the point.

## DISPOSITION

The judgment is affirmed.

Hull, J., and Kolkey, J., concurred.