[No. D059511. Fourth Dist., Div. One. Sept. 27, 2012.]

THE PEOPLE, Plaintiff and Appellant, v.
LAVERN JOHNSON et al., Defendants and Respondents.

## Counsel

Paul E. Zellerbach, District Attorney, Ivy B. Fitzpatrick and Gregory R. Albright, Deputy District Attorneys, for Plaintiff and Appellant.

Lauren E. Eskenazi, under appointment by the Court of Appeal, for Defendant and Respondent Lavern Johnson.

Dennis L. Cava, under appointment by the Court of Appeal, for Defendant and Respondent Purcell Johnson.

## Opinion

**O'ROURKE, J.**—The People appeal from an order granting in part the Penal Code[1] section 995 motions of defendants and respondents Lavern Johnson and Purcell Johnson to dismiss certain counts of a 149-count indictment charging them with criminal offenses in connection with their operation of "T-Town," a nonprofit group home. In the indictment, defendants were charged with conspiracy to commit fraud (§ 182, subd. (a)(4)); 24 counts of

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

misappropriation of public funds (§ 424, subd. (a)(1));[2] 24 counts of grand theft (§ 487, subd. (a)); 24 counts of embezzlement of public funds (§ 504); four counts of identity theft (§ 530.5, subd. (a)); 41 counts of forgery (§ 470, subd. (a)); and 31 counts of money laundering (§ 186.10, subd. (a)). The trial court dismissed all 24 counts of misappropriation of public funds, ruling defendants could not be held criminally liable under section 424 because they were not public officers and T-Town was not a public agency. It also dismissed the identity theft counts, ruling there was insufficient evidence to bind defendants over for trial.

On appeal, the People contend the trial court erred as a matter of law by dismissing the charges of misappropriation of public funds because the moneys received and disbursed by T-Town are "public moneys" within the meaning of section 424, subdivision (a)(1). The People further contend the court erred as a matter of substantive law and violated their right to due process of law by setting aside the four counts of identity theft.

We conclude, based on the evidence before the grand jury, defendants are "person[s] charged with the receipt, safekeeping, transfer, or disbursement of public moneys" within the meaning of sections 424 and 426, and thus there was probable cause to hold defendants to answer for the misappropriation of public funds counts. We further agree with the People that the trial court erred by dismissing the four identity theft counts. Accordingly, we reverse the order dismissing those counts and remand with directions set forth below.

## FACTUAL AND PROCEDURAL BACKGROUND

We state the background facts from the record of testimony before the grand jury, as well as the relevant California law and regulations[3] governing group home providers.

Purcell Johnson and Laverne Johnson are the operators of T-Town, a nonprofit group home childcare facility[4] licensed by the Community Care

---

[2] The People alleged misappropriation of public funds in counts 2, 5, 8, 11, 14, 17, 20, 23, 26, 29, 32, 35, 38, 41, 44, 47, 50, 53, 56, 59, 62, 65, 68 and 71.

[3] Welfare and Institutions Code section 10554 authorizes the State Department of Social Services to print certain of its regulations in publications rather than in the California Code of Regulations. (See *Sacramento Children's Home v. State Dept. of Social Services* (2000) 81 Cal.App.4th 786, 789, fn. 2 [97 Cal.Rptr.2d 203].) The regulations relevant here are within division 11 of the State Department of Social Services manual of operating procedures, which we will refer to hereafter as the "DSS Manual."

[4] Title 22 of the California Code of Regulations defines " 'Group Home' " in part as a "facility which provides 24-hour care and supervision to children, provides services specified in this chapter to a specific client group, and maintains a structured environment, with such services provided at least in part by staff employed by the licensee." (Cal. Code Regs., tit. 22,

Licensing Division of the State Department of Social Services (DSS). Group homes receive payments from a mix of federal, state and county agencies (50 percent federal, 20 percent state and 30 percent county) based on a "rate care level" assigned to that home at the time it receives its license. The State of California sets group home rates via a point system established by the Foster Care Rates Bureau of the DSS Foster Care Audits and Rates Branch (Branch). (See *Sacramento Children's Home v. State Dept. of Social Services, supra,* 81 Cal.App.4th at p. 789.) Each rate is a dollar amount provided every month for the care of a single child, and that amount consists entirely of government funds. The monthly checks are generated via an automated system within a division of Child Protective Services. Child Protective Services is itself a division of DSS. Each check is made out to the group home payee, and has a field identifying the child's name and pertinent month.

Because DSS is a federal grant recipient, group homes, which are subrecipients of the federal funds passed down from the state and county, must follow federal rules and regulations. The funds provided to each group home are subject to state and federal regulations that identify allowable and disallowed costs. Federal requirements (Off. of Management and Budget circular No. A-122) provide more details of what are allowable and unallowable costs, and also mandate and provide guidelines for independent audits. Those federal requirements also outline how a provider is to record its direct costs for items such as food and clothing, as well as indirect costs for items such as overhead and insurance.

California regulations require group homes to undergo various audits to ensure compliance with all DSS requirements. (DSS Manual, §§ 11-402.5, 11-402.51, 11-405.1 to 11-405.2; *Sacramento Children's Home v. State Dept. of Social Services, supra,* 81 Cal.App.4th at p. 790.) California law also authorizes such audits and requires group homes to maintain specified records for at least five years. (Welf. & Inst. Code, § 11466.2, subd. (a)(1) ["The department shall perform or have performed group home program and fiscal

---

§ 84001, subd. (g)(1).) Any facility providing 24-hour care for seven or more children must be licensed as a group home. (*Ibid.*) California regulations incorporate by reference a publication entitled, "Facts You Need to Know, Group Home Board of Directors," which, among other things, explains that a group home must be organized and operated as a nonprofit corporation with a board of directors, and must undergo a financial audit, a statutory requirement that contributes to accountability by providing independent reports by certified public accountants on (1) accounting and internal control systems; (2) fairness of financial information as presented in financial statements; and (3) compliance with laws and regulations. (Cal. Code Regs., tit. 22, § 84002, subd. (b); Facts You Need to Know, Group Home Board of Directors, pp. 1, 3, 5, 24 <http://www.dss.cahwnet.gov/forms/english/pub326.pdf> [as of Sept. 27, 2012].) Odd-numbered pages of the publication are in the record, along with Lavern Johnson's acknowledgement that she received, read and understood the publication and its contents. We take judicial notice of the entire publication as official regulations. (Evid. Code, §§ 452, subd. (b), 459.)

audits as needed. Group home programs shall maintain all child-specific, programmatic, personnel, fiscal, and other information affecting group home ratesetting and AFDC-FC payments for a period not less than five years."].) A fiscal audit assesses the financial condition of the nonprofit entity to see how it has spent its foster care funds, and ensures the funds were spent for allowable and reasonable costs.

The Foster Care Program and Financial Audits Bureau (Audits Bureau) of the Branch oversees and receives the financial audits of group homes either annually or triannually. Group home providers are informed at the outset of the audit requirements and are told they must maintain at least five years of receipts and supporting documentation for all expenses to show they are allowable. Providers are required to provide DSS immediate access to its program records or facilities when given notice of a fiscal or program audit, or be subject to termination of its rate. (See DSS Manual, §§ 11-402.524, 11-402.525.)

Starting in 1999, group homes are also required by California law and regulations to submit a financial audit report conducted in accordance with specified government auditing standards by an independent licensed certified public accountant within the State of California in order to receive a rate each year. (See Welf. & Inst. Code, § 11466.21; DSS Manual, §§ 11-405.2, 11-405.211, 11-405.212.) State law and federal regulations determine the frequency and timeframe within which such a report must be submitted, depending on whether the home's combined federal revenues are above or below a particular amount. (See Welf. & Inst. Code, § 11466.21.) A group home is notified of this requirement, and provided with a copy of the pertinent regulations, at the time it receives its rate letter. This information is also given to applicants interested in becoming a group home provider.

An "overpayment" occurs when a provider receives more benefits than it was entitled to receive. If a group home provider has extra funds that are not spent on 24-hour care for the children in its care, the provider must put the funds back into the program. DSS has a recovery department whose employees collect overpayments in connection with public assistance programs, including foster care group homes.[5] A DSS eligibility worker determines when an overpayment occurs, enters the information in the system, and the recovery technicians pursue debt collection efforts: they notify customers

---

[5] Michelle Franklin, the supervisor for DSS's investigation and recovery unit, testified to the grand jury that starting in 2006, her department had two recovery technicians designated for foster care because overpayments in that area were "out of control." Prior to that time, group home overpayments, even from the same home, could be handled by multiple recovery technicians. Franklin explained that for the most part, overpayments occurred because children left the home and the provider did not notify the eligibility worker of that occurrence.

of the fact of overpayment and specify why it happened, notify them of a right to an administrative hearing on the matter, make arrangements with them to make repayments, monitor payments, and conduct skip tracing to locate customers in order to set up repayment agreements. If a state audit reveals unsupported costs or funds that have been misused by a group home provider, the state must immediately repay 50 percent of the disallowed costs to the federal government. If the home is unable to repay those costs, the law permits them a maximum period of nine years to make monthly payments to DSS. (See Welf. & Inst. Code, § 11466.22, subd. (d)(3).)

A group home is selected for a fiscal audit based on a review of its financial audit report and assignment of a risk rating based on matters such as negative cash balances, overpayments, and debt. Providers with a risk rating of 7 or above (out of 10) would be referred for audit. T-Town fell within a high risk rating, in the 7 to 10 range, but it was not audited for some years due to budget constraints.[6] As of 2006, when DSS began running audits again, T-Town owed overpayments of $213,232 going back as far as 1999.

In May 2010, the Riverside County District Attorney charged defendants with numerous crimes in connection with their operation of T-Town: conspiracy to commit fraud, misappropriation of public funds, grand theft, embezzlement of public funds, identity theft, forgery, and money laundering. Both pleaded not guilty to the charges.

Defendants thereafter separately moved under section 995 to dismiss the misappropriation of public funds charges in the indictment. Purcell Johnson argued for dismissal of all of the counts alleging a violation of section 424, subdivision (a)(1) on the grounds he was neither an officer of the state, county, city, town or district of the state, nor a person charged with the receipt, safekeeping, transfer, or disbursement of public moneys.

Lavern Johnson likewise argued section 424, subdivision (a)(1) did not apply because the funds were not public moneys. She conceded that T-Town obtained its funds from public sources, but maintained once the nonprofit corporation received the funds they were no longer public, even though they were to be used for public purposes.

The People opposed the motion, summarizing much of the evidence presented to the grand jury. Addressing defendants' assertions regarding the

---

[6] Cora Dixon, the bureau chief of the Audits Bureau within the Branch, testified that as of May 2010, the audit office had no staff. However, the Branch performed about 22 fiscal audits per year (at the time referred to as investigation audits) from 1999 through 2003. At the end of 2003, the audit unit was eliminated due to budget constraints, but was reestablished in fiscal years 2006 to 2009. The unit was eliminated again at the end of June 2009.

nature of the funds, the People argued that the proper criterion to determine whether funds were "public moneys" within the meaning of the statute was the " 'official character in which [the] moneys are received or held' " and not " '[u]ltimate ownership.' " The People pointed out that while T-Town was a nonprofit organization, it was "at the mercy of the government to follow rules, regulations, and licensing requirements in order to receive public monies." They argued: "T-Town exists for the public good by its nonprofit charitable and humanitarian nature and is expected to be accountable to the public. That is why it must submit audits and comply with procedures. . . . T-Town has no authority, it makes no rules, it is not a public body corporate or politic, but rather must be strictly regulated, comply with self audits, and be subject to government rules in order to remain licensed and continue running . . . . Furthermore, when monies were misused by T-Town, there is a snowball [effect] where the state or county must pay back the monies they received from the federal government and there are spelled out guidelines as to inappropriate uses of the government funds T-Town received. As such, the defendants were in charge of public monies as defined by Section 426." (Underscoring omitted.)

The trial court found that defendants were not employees, agents or officers of any governmental agency, and that T-Town was not a governmental agency. It found "directly on point" the case of *People v. Holtzendorff* (1960) 177 Cal.App.2d 788 [2 Cal.Rptr. 676] (*Holtzendorff*), which affirmed the dismissal of section 424 counts against a defendant who diverted funds from the Los Angeles Housing Authority, a public corporation, to pay salaries of persons working on his political campaign. According to the trial court, the present matter was "even beyond *Holtzendorff*" in that the section 424 misappropriation claims against the Johnsons involved a "private corporation [that] was engaged by the County to provide private services." Thus, it granted the Johnsons' motions to dismiss the misappropriation counts, on grounds the matter was not controlled by section 424—that the statute did not apply to the facts.

After the People's ensuing petition for a writ of prohibition/mandate was summarily denied, they filed the present appeal from the trial court's order partially granting defendants' motions.

## DISCUSSION

### I. *Standard of Review*

Section 995 requires a court to set aside an indictment on a motion where "the defendant has been indicted without reasonable or probable cause." (§ 995, subd. (a)(1)(B).) " ' " ' "Evidence that will justify a prosecution need

not be sufficient to support a conviction. . . . An [indictment] will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." ' " ' " (*D'Amato v. Superior Court* (2008) 167 Cal.App.4th 861, 880 [84 Cal.Rptr.3d 497], quoting *Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1026–1027 [13 Cal.Rptr.2d 551, 839 P.2d 1059].)

On appeal from the grant of a defendant's section 995 motion, we " 'in effect disregard[] the ruling of the superior court and directly review[] the determination of the [grand jury] holding the defendant to answer.' [Citations.] Insofar as the . . . section 995 motion rests on issues of statutory interpretation, our review is de novo. [Citation.] Insofar as it rests on consideration of the evidence adduced, we must draw all reasonable inferences in favor of the [indictment] [citations] and decide whether there is probable cause to hold the defendants to answer, i.e., whether the evidence is such that 'a reasonable person could harbor a strong suspicion of the defendant's guilt . . . .' " (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072 [103 Cal.Rptr.3d 767, 222 P.3d 214]; see *People v. Magee* (2011) 194 Cal.App.4th 178, 182–183 [123 Cal.Rptr.3d 689].) In this context, the issue is not whether substantial evidence supports the trial court's ruling on the motion, but whether substantial evidence supports the grand jury's decision holding the defendants to answer the charges. (*People v. Davis* (2010) 184 Cal.App.4th 305, 311 [108 Cal.Rptr.3d 536].) "Only the . . . grand jury . . . is permitted to weigh the evidence or judge credibility, and all presumptions on appeal are in favor of that decision." (*Ibid.*; see *Magee*, at pp. 182–183.)

## II.  *Misappropriation of Public Funds*

### A.  *Legal Principles*

Section 424 provides: "(a) Each officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who either: [¶] 1. Without authority of law, appropriates the same, or any portion thereof, to his or her own use, or to the use of another . . . [¶] . . . [¶] Is punishable by imprisonment in the state prison for two, three, or four years, and is disqualified from holding any office in this state." (§ 424, subd. (a).) Section 424 " 'has to do solely with the protection and safekeeping of public moneys . . . and with the duties of the public officer charged with its custody or control . . . .' " (*Stark v. Superior Court* (2011) 52 Cal.4th 368, 380 [128 Cal.Rptr.3d 611, 257 P.3d 41].)

The Legislature defines what constitutes public moneys in section 426. That section provides: "The phrase 'public moneys,' as used in Sections 424

and 425, includes all bonds and evidence of indebtedness, and all moneys belonging to the state, or any city, county, town, district, or public agency therein, and all moneys, bonds, and evidences of indebtedness received or held by state, county, district, city, town, or public agency officers in their official capacity." (§ 426; see *Stark v. Superior Court, supra*, 52 Cal.4th at p. 380, fn. 3.)

In determining whether funds are public moneys within the meaning of section 424, the proper criterion is "[t]he official character in which the moneys are received or held." (*People v. Griffin* (1959) 170 Cal.App.2d 358, 363 [338 P.2d 949].) "Ultimate ownership is not a proper criterion." (*Ibid.*, citing *People v. Crosby* (1956) 141 Cal.App.2d 172, 175 [296 P.2d 438]; accord, *People v. Best* (1959) 172 Cal.App.2d 692, 695–696 [342 P.2d 314] [citing cases].)

Thus, in various contexts, funds misused by defendants in their official capacities such as a public administrator, court clerk or peace officer constitute public moneys as defined in section 426, even if the funds originate from a private source. (See *People v. Groat* (1993) 19 Cal.App.4th 1228, 1233–1235 [24 Cal.Rptr.2d 15] [manager of city department who had ability to authorize her own pay violated § 424 by submitting timecards indicating time worked or sick when she was neither at work nor sick but was teaching classes]; *People v. Sperl* (1976) 54 Cal.App.3d 640, 657–658 [126 Cal.Rptr. 907] [county marshal ordered a deputy marshal to transport a political candidate, his family and staff in a county vehicle while the deputy was paid his wages by the county; court upheld conviction under § 424 on grounds defendant as a county officer misappropriated county salaries for personnel performing activities clearly outside the scope of their duties]; *People v. Crosby, supra*, 141 Cal.App.2d at pp. 174–175 [money from private estates entrusted to defendant, a public administrator of San Mateo County, was public money because it was received and held by him in his official capacity]; *People v. Griffin, supra*, 170 Cal.App.2d 358, 360–363 [bail deposits received, but diverted, by a deputy clerk with the duty of receiving and handling the court money were public moneys because the deposits were received by her in her official capacity]; *People v. Best, supra*, 172 Cal.App.2d at pp. 694–695 [bail money paid by a prisoner to a police officer in charge of and assigned the duty of receiving and transmitting bail money met the definition of public money for purpose of upholding police officer's conviction under § 424; "[s]ection 424 was clearly intended by the Legislature to provide a broad salutary means of punishing public officers who betray their public trust by taking for their own use public money being handled by them in their official capacity"]; *People v. Dillon* (1926) 199 Cal. 1, 3–4 [248 P. 230] [purchases made by City of Fresno's commissioner of finance and purchasing agent for private parties at city's discounted rate supported conviction under § 424].)

■ However, it is not necessary for a violation of section 424 that the misappropriation be made by a person while acting in an official capacity. The definition of public moneys is "phrased in inclusive language so the definition is met if the money either belongs to the state *or* is received or held by a state officer acting in his or her official capacity." (*Center for Public Interest Law v. Fair Political Practices Com.* (1989) 210 Cal.App.3d 1476, 1481 [259 Cal.Rptr. 21].) Accordingly, "[s]ection 424 is not limited to public officers. 'Because of the essential public interest served by [section 424] it has been construed very broadly.' [Citation.] It applies to 'every other person' with some control over public funds." (*Stark v. Superior Court, supra*, 52 Cal.4th at p. 400, quoting *People v. Groat, supra*, 19 Cal.App.4th at p. 1232.) Further, given the broad construction of the statute, a defendant need not ever have actual possession of public moneys and the control "need not be the primary function of the defendant in his or her job." (*Groat*, at pp. 1232–1233.)

B. *The Moneys Received by T-Town Remain Government Moneys Due to the High Degree of Supervision and Control over Their Disbursement*

The evidence before the grand jury was undisputed that 100 percent of the funds received by group homes generally, and T-Town particularly, are government funds. There is no dispute T-Town is a private nonprofit corporation. No party asserts that defendants are government employees or officers, and there is no claim by the People that either Lavern Johnson or Purcell Johnson received or held funds paid to T-Town in any official capacity. The authorities cited above involving the diversion of moneys received by public officials in their official capacities are therefore inapposite to the case at hand.

The specific question here is one of first impression: When a private nonprofit group home receives government funds for the care of designated children, do those funds thereafter cease to "belong[] to" the government for purposes of section 424? (§ 426.) Pointing to the regulations and guidelines for the use of group home funding, the People maintain the money given to T-Town remained public funds within the meaning of the statute—that is, the moneys belonged to the state, county or other public agency—even after respondents cashed the checks, because the government maintained an extensive degree of control over the money and it was to be used for a specific purpose: providing for the welfare of designated foster children.

Lavern Johnson responds that T-Town's dependence on public funds is not determinative of its liability under section 424—that the omission of private nonprofit corporations from the definition in section 426 shows that the Legislature intended to exclude nonprofit corporations like T-Town from liability. Purcell Johnson likewise argues that if the Legislature had intended

for payments received by group homes to be public moneys, it would have inserted the words "private non-profit corporation" in section 426, and any statutory ambiguity must be resolved in defendants' favor. He argues the People have not considered that neither he nor Lavern Purcell had authority to approve the public funds T-Town requested, and T-Town did not have any authority to order the expenditure of public moneys. He argues that in view of these circumstances, and because T-Town was not a custodian of public moneys, it could not be guilty of misappropriation of public funds under section 424. Both defendants rely on *Holtzendorff, supra,* 177 Cal.App.2d 788, as did the trial court in dismissing the misappropriation counts.

In *Holtzendorff, supra,* 177 Cal.App.2d 788, the defendant, who was the executive director, secretary, and treasurer of the Los Angeles Housing Authority (Authority), became interested in a political campaign and persuaded Authority employees to help him, paying them with checks drawn from Authority's bank accounts. (*Id.* at p. 793.) A grand jury indicted the defendant with multiple counts of both embezzlement of public moneys and misappropriation under section 424, but those counts were set aside on the defendant's motion and the People appealed. (177 Cal.App.2d at pp. 791–792.)

The Court of Appeal affirmed the order setting aside the misappropriation counts as without reasonable or probable cause, holding the evidence did not justify the conclusion that the moneys appropriated were public moneys within the meaning of the statute. (*Holtzendorff, supra,* 177 Cal.App.2d at pp. 796–797.) The court observed the defendant was not an officer of the state, county, district or town, and the money did not belong to the state or any other state subdivisions listed in section 426's definition, but to Authority, which was a public corporation, an entity not listed in the definition. (177 Cal.App.2d at pp. 797–798.) It concluded, based on the limited definition in section 426, that the misappropriation of public funds offense of section 424 did not apply to an officer or money of Authority despite its public character: "[A] public agency though it is, [Authority] is not the State, nor a county, city, town or district. The Legislature, in adopting the definition it gave in section 426 for the use of the words in section 424, might have included moneys belonging to or officers of a public corporation, but it did not. The moneys and the officers of the Authority are not governed by section 424 . . . ." (*Holtzendorff,* at p. 797.)

We disagree that *Holtzendorff* provides a definitive answer to the issue at hand. First, we question the *Holtzendorff* court's focus on the omission of particular public agencies from the definition in section 426. As indicated above, in section 424 the Legislature expressly subjected to liability "other person[s]" who are "charged with the receipt, safekeeping, transfer, or

disbursement of public moneys . . . ." (See *People v. Groat, supra*, 19 Cal.App.4th at p. 1233.) Thus, the statutory definition need not identify every possible entity or person who is charged with handling public funds in order to subject such persons to liability. The pertinent inquiry was whether Authority's funds constituted public moneys within the meaning of the statute. The court in *Holtzendorff* did not identify the actual source of Authority's funding, only stating that it was public money, but not money "belong[ing] to the state or to any of the other state subdivisions listed in section 426." (*Holtzendorff, supra*, 177 Cal.App.2d at p. 797.)

Unlike *Holtzendorff*, the evidence before the grand jury in the present case established that defendants were paid with federal, state and county moneys to disburse to specified children in their care or on their behalf. There is no question the funds given to T-Town were originally property of the government. The issue is whether they *retained* this status after transfer to T-Town. Thus, *Holtzendorff* does not resolve the question presented here.

Instead, we find persuasive the analysis and reasoning of the Ninth Circuit and other federal courts with respect to the federal theft of government property statute, section 641 of title 18 of the United States Code.[7] The Ninth Circuit holds that money is "money . . . of the United States" within the meaning of title 18 United States Code section 641 if the government has "title to, possession of, *or control over*" the funds at issue. (*U.S. v. Johnson* (9th Cir. 1979) 596 F.2d 842, 846 (*Johnson*); see *U.S. v. Kranovich* (9th Cir. 2005) 401 F.3d 1107, 1113, italics added; *U.S. v. Faust* (9th Cir. 1988) 850 F.2d 575, 579; *U.S. v. Long* (9th Cir. 1983) 706 F.2d 1044, 1049; *U.S. v. Hughes* (9th Cir. 1980) 626 F.2d 619, 622, overruled on other grounds in *U.S. v. De Bright* (9th Cir. 1984) 730 F.2d 1255, 1259.) This is so even when the funds are commingled with nonfederal funds, as long as the government " 'exercises supervision and control over the funds and their ultimate use.' " (*U.S. v. Kranovich*, at p. 1113, quoting *U.S. v. Von Stevens* (9th Cir. 1985) 774 F.2d 1411, 1413; see *Johnson*, at pp. 844–846.)

In *Johnson, supra*, 596 F.2d 842, for example, the Ninth Circuit upheld the conviction of a defendant who had paid salaries to fictitious employees out of grant funds deposited with the San Francisco Redevelopment Agency. (*Id.* at p. 844.) The agency had entered into contracts with a union for certain maintenance services. (*Id.* at pp. 843–844.) The defendant, a high-ranking union officer, contended the United States had no interest in the funds after title to the funds passed to the redevelopment agency. (*Ibid.*) The Ninth

---

[7] Title 18 United States Code section 641 provides in part: "Whoever embezzles, steals, purloins or knowingly converts to his use or the use of another . . . any record, voucher, money, or thing of value of the United States or of any department or agency thereof . . . [¶] . . . [¶] Shall be fined under this title or imprisoned not more than ten years, or both . . . ."

Circuit disagreed, holding as a matter of law the funds remained federal property. (*Id.* at p. 845.) The evidence showed the funds were deposited in trust with the agency to be held and disbursed "under the strictest of supervision" (*id.* at p. 846) in accordance with terms, conditions and provisions of legislation and regulations that required the redevelopment agency to maintain detailed financial records, file annual financial and progress reports, and adopt government-prescribed financial management systems. (*Id.* at pp. 844–845.) The agency was required to return interest earned on grant funds to the federal government and record the receipt and expenditure of revenues related to the program; the government retained control to the extent of requiring the agency to use all excess funds for purposes contemplated by the legislation and regulations. (*Id.* at p. 845.) The defendant signed the agency's contracts with the union, which required the union to keep records in accordance with prudent business practices to allow authorized representatives of the United States Department of Housing and Urban Development to have access at all reasonable times to the records, reports, work schedule files, and other materials maintained by the unions pertaining to the services to be performed under the contract. (*Ibid.*) On this evidence and in view of the relevant statutes and regulations, the Ninth Circuit held the government contemplated and manifested sufficient supervision and control over the funds for the maintenance program to justify the conviction for theft of government property. (*Id.* at p. 846.)

In *U.S. v. Kranovich, supra,* 401 F.3d 1107, the defendant was a sheriff of a department that had entered into an agreement with the federal government for the sharing of cash, property and other forfeited assets. (*Id.* at p. 1109.) In order to receive the funds, the sheriff's department had to abide by numerous restrictions in the agreement, including separately accounting for the federal sharing funds to prevent commingling with other funds, submission of an annual certification report to specified federal departments, and audits as provided by certain federal provisions. (*Id.* at pp. 1109–1110.) The defendant used checks to withdraw funds from the program account and used the money for his own purposes. (*Id.* at p. 1110.) After he was convicted of theft of federal money, he argued the program funds were not property of the United States because there was no federal oversight of the funds after they were transferred to his county. (*Id.* at p. 1113.) The Ninth Circuit disagreed, pointing to the agreement's requirements and noting the sheriff's department was subject to sanctions for failure to comply. (*Id.* at pp. 1113–1114.) It held the nature and extent of the federal government's control over the program funds was commensurate with controls previously deemed sufficient for an offense under title 18 United States Code section 641. (401 F.3d at p. 1114.)

In *U.S. v. Von Stephens, supra,* 774 F.2d 1411, the Ninth Circuit upheld the denial of a motion to dismiss an indictment alleging theft of government property against a defendant who received and cashed Aid to Families with

Dependent Children (AFDC) warrants unlawfully issued in his name through the help of a social services employee. (*Id.* at pp. 1412–1413.) Forty-nine percent of the AFDC fund consisted of federal money, which was commingled with state and county money. (*Id.* at p. 1413.) The Ninth Circuit held the federal government had sufficient interest in the commingled funds in view of evidence it required state audits and reports quarterly, conducted onsite reviews, interviewed recipients, examined recipients' bank accounts, and checked employers' rolls for recipients. (*Ibid.*) All of this supervision and control demonstrated a strong government interest in the AFDC funds, and the court found it immaterial that the federal government contribution was less than half of the fund. (*Ibid.*)[8]

Here, it is manifest that DSS, via its various divisions, retained an interest in, and extensive control over, all of the funding provided to T-Town through the above described requirements, both under state law and state and federal regulations. The fact the funds were a combination of state, federal and county funds is of no significance. The DSS identifies the recipient child on each check and limits the disbursement of moneys to specified allowable

---

[8] Other federal courts apply a supervision and control test for determining whether property belongs to the government for purposes of the federal misappropriation statute. (*U.S. v. Hall* (6th Cir. 2008) 549 F.3d 1033, 1035–1037, 1040 [upholding convictions of defendant who prepared fraudulent purchase orders for work on cost-reimbursement subcontracts awarded to his company by the private prime contractor/manager of a national laboratory funded entirely by the Department of Energy (DOE); subcontracts required defendant's company to perform yearend reconciliation comparing government reimbursements it received with actual overhead expenses and return overpayments to the DOE through the prime contractor; court held there was indicia of government supervision and control over the funds including requirement that the company adopt an acceptable method of accounting and that its accounts were subject to audit by the prime contractor and/or the government and thus interim reimbursement funds remained property of the U.S.]; *U.S. v. Foulks* (6th Cir. 1990) 905 F.2d 928, 929–930 [affirming conviction of Salvation Army director who misappropriated checks drawn on emergency relief account funded by the Federal Emergency Management Agency (FEMA), which disbursed money to local relief agencies for food and shelter programs; Salvation Army was required after receiving FEMA funds to report back to the federal agency and return unused or misused funds and under these circumstances the court held "[w]here the government retains power over grant funds, those funds retain their federal character even though deposited into accounts of non-federal agencies"]; *U.S. v. Littriello* (4th Cir. 1989) 866 F.2d 713, 714–716 [upholding convictions of defendants who skimmed money from American Postal Workers Union Health Plan; court held that federal regulations imposed sufficient federal control over the plan to render the funds government property as they required the plan to establish a special reserve fund, invest and credit all interest to the fund, disburse plan funds only for contractual obligations, keep detailed records relating to the fund's financial status, furnish an annual accounting of its operations to the federal Office of Personnel Management (OPM) and submit to audits by OPM as well as yearly audits by a certified public accounting firm]; *U.S. v. Evans* (5th Cir. 1978) 572 F.2d 455, 470–472 [involving loan funds from the National Direct Student Loan Program which were administered by participating colleges; statutes involved manifested "an underlying congressional intent that the Office of Education should maintain regulatory control of funds to which federal capital contributions are made"], repudiated in part on other grounds in *U.S. v. Barnes* (5th Cir. 1985) 761 F.2d 1026, 1036.)

costs. It requires the group home provider to provide independent financial audit reports and maintain specified records, and conducts its own audits. A group home provider must give DSS representatives access to program records when notified of an audit, and may be subject to the sanction of rate termination if it does not comply. Unspent moneys are to be returned to the program or the federal government. DSS actively pursues collection of overpayments. The fact DSS was unable to undertake group home audits for a number of years does not affect the status of the funds as belonging to the public. We will not countenance defendants' ability to skirt the law in cases where a lack of agency funding permits them to conceal their scheme from DSS's regulatory oversight.

■ We conclude as a matter of law that, by virtue of the state's supervision and regulatory control, group home moneys are moneys belonging to the state, county or other public agency. Further, defendants—the persons who had access to T-Town's bank accounts and who were obligated to expend the moneys on behalf of the children in their care in accordance with DSS regulations—are unquestionably "person[s] charged with the receipt, safekeeping, transfer, or disbursement of public moneys" within the meaning of sections 424 and 426. Thus, there was probable cause to hold defendants to answer for the misappropriation of public money counts. The trial court's order dismissing those counts must be reversed.

### III. Section 530.5 Identity Theft Counts

Counts 74, 89, 96 and 107 allege that defendants "did wilfully and unlawfully obtain personal identifying information of another person . . . and use that information for an unlawful purpose, including to obtain, or attempt to obtain credit, goods, services and medical information in the name of the other person without the consent of that person." The People presented evidence to the grand jury suggesting that Purcell Johnson cashed T-Town checks written to four individuals and businesses without their permission, namely, T-Town employee Craig Washington, maintenance worker Larry Jeter, and the businesses of Charles McElhaney and Yong Yang, both mechanics at different shops who worked on defendants' vehicles. The checks were cashed at a local liquor store frequented by Purcell Johnson.

After dismissing the misappropriation counts, the trial court proceeded on its own motion to dismiss counts 74, 89, 96 and 107. The court said: "Also, I looked very carefully at the [section] 530.5 sections, and while these have not really specifically been addressed by the defense, it's clear to me that there was no identity theft in these cases, in looking at the evidence. [¶] So I am granting the motion as to [counts] 74, 89, 96, 107." The People asked to be heard on the matter, and the court declined to permit argument, explaining,

"No. I've ruled on that. I don't think there's sufficient evidence to support any kind of identity theft, under these circumstances. [¶] . . . [¶] I don't think any of these, quote, 'alleged victims of identity theft' suffered any kind of damages, losses of any type, were in danger of suffering any losses, or in danger of being sued or being prosecuted, or being held liable for anything that either Purcell or Lavern Johnson did with regard to their identities."

The People challenge this order on two grounds. First, they maintain the court's sua sponte dismissal of the identity theft counts violated the People's fundamental right to due process of law, namely, notice and an opportunity to be heard on the matter. Second, the People argue the dismissal was erroneous as a matter of substantive law because there is no requirement that the People prove as an element of the offense a victim of identity theft suffered any loss or damage.

As we will explain, we agree with the latter contention. Accordingly, we need not reach the People's due process argument.

Section 530.5, subdivision (a) provides: "Every person who willfully obtains personal identifying information . . . of another person, and uses that information for any unlawful purpose, including to obtain, or attempt to obtain, credit, goods, services, real property, or medical information without the consent of that person, is guilty of a public offense . . . ."

"As originally enacted in 1997, section 530.5 made it a misdemeanor to obtain personal identifying information of another person *and use* that information to obtain or attempt to obtain credit, goods or services in the name of the other person without their consent. (Stats. 1997, ch. 768, § 6, p. 5205, eff. Jan. 1, 1998.) The statute was later amended to make the offense punishable as a felony or a misdemeanor and to provide some relief to the victim of identity theft. (Stats. 1998, ch. 488, § 1, p. 3531; Stats. 2000, ch. 956, § 1, p. 7043.) In 2002, the Legislature amended section 530.5 again, to make it a misdemeanor offense to acquire, transfer, or retain possession of another's personal identifying information with the intent to defraud. (Stats. 2002, ch. 254, § 1, p. 1072.) As the author of the bill to amend the statute explained, the problem of identity theft had grown since the original enactment, as identity thieves began to compile lists of victims' names and other identifying information that could be used to open fraudulent accounts or take over existing accounts. Under then existing law, law enforcement could not charge those thieves with identity theft until they used the information, even if they admitted their intent to sell the information to others or use it themselves. The author explained the amendment was needed to protect the victims of identity fraud, who cannot protect themselves from fraudulent use of their identifying information once it is in the possession of another,

because they cannot easily change their name, date of birth, Social Security number, or address. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1254 (2001–2002 Reg. Sess.) as amended Mar. 11, 2002.)" (*People v. Valenzuela* (2012) 205 Cal.App.4th 800, 806–807 [141 Cal.Rptr.3d 34].) *Valenzuela* explains that these amendments, as well as later amendments in 2006, reflect the Legislature's intent that the retention of personal identifying information of another is not a possession crime, but a unique theft crime. (*Id.* at pp. 807–808.)

■ "In order to violate section 530.5, subdivision (a), a defendant must both (1) obtain personal identifying information, and (2) use that information for an unlawful purpose. [Citation.] Thus, *it is the use of the identifying information for an unlawful purpose that completes the crime* and each separate use constitutes a new crime." (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 455 [78 Cal.Rptr.3d 855], italics added, citing *People v. Tillotson* (2007) 157 Cal.App.4th 517, 533 [69 Cal.Rptr.3d 42].)

In *People v. Hagedorn* (2005) 127 Cal.App.4th 734 [25 Cal.Rptr.3d 879], the Fifth District Court of Appeal considered the defendant's claim that section 530.5, as applied to him, violated due process because it was unconstitutionally vague and that the only conduct covered by the statute was conduct committed with an intent to defraud. (127 Cal.App.4th at pp. 739–741.) In part, the defendant argued the statute "did not give him fair warning that he was committing a crime by cashing a check, albeit in the name of another, for work he himself performed and without causing harm or loss to the issuer of the check, the check cashing store, or the person whose identity he used." (*Id.* at pp. 740–741.) Thus, he argued, the statute had to be construed as requiring an intent to defraud. (*Id.* at pp. 739–741, 744.)

■ The appellate court disagreed: "In our view, [section 530.5,] subdivision (a) clearly and unambiguously does *not* require an intent to defraud." (*People v. Hagedorn, supra,* 127 Cal.App.4th at p. 741.) In reaching that conclusion, the court considered the entire statute and the fact the Legislature had expressly included in a different subdivision of the same statute the element of intent to defraud. (*Id.* at pp. 741–742.) It observed that the Legislature therefore knew how to provide for such an element when it wished to do so, and its absence from section 530.5, subdivision (a) made it "apparent . . . that the Legislature chose to treat use of personal identifying information, as opposed to mere acquisition or possession, as the more serious offense and worthy of a more expansive scope." (127 Cal.App.4th at p. 742.)

■ The Court of Appeal explained further that the absence of an intent element was not unusual or extraordinary: " '[I]t is beyond question that the

Legislature may, and has, defined crimes and punishments in which causation analysis plays no practical part. For example, if a defendant has possessed contraband, burglarized a premises or battered another, criminal punishment is imposed to deter socially intolerable conduct *regardless of any injury which may have been caused by the act.* [Citation.]' [Citation.] In light of the indisputable evil to be remedied with respect to identity theft, the Legislature rationally appears to have concluded that willfulness, when coupled with use for an unlawful purpose, provides a sufficient mens rea for the offense, and *that no injurious intent or result is required.* [Citation.] 'The judiciary ordinarily has no power to insert in a statute an element the Legislature has omitted [citation]' [citation]; where, as here, the statute has an appropriate mens rea requirement, 'no reason appears . . . to warrant departure from this rule.' " (*People v. Hagedorn, supra,* 127 Cal.App.4th at p. 744, italics added, fn. omitted.) It noted its conclusion was supported by the use of the word "willfully," which " 'is a synonym for "intentionally," i.e., the defendant intended to do the act proscribed by the penal statute' " and under section 7 did not " 'require any intent to violate law, or to injure another, or to acquire any advantage.' " (*Id.* at p. 744, fn. 6.) The court concluded that the absence of an intent to defraud element did not render the statute unconstitutionally vague as to the defendant. (*Id.* at pp. 744–747.)

It is evident from the legislative history of section 530.5 and *Hagedorn* that the purpose of section 530.5, subdivision (a) is to criminalize the willful use of another's personal identifying information, regardless of whether the user intends to defraud and regardless of whether any actual harm or loss is caused. (Accord, CALCRIM No. 2040 [setting forth elements of identity theft and providing, "It is not necessary that anyone actually be defrauded or actually suffer a financial, legal, or property loss as a result of the defendant's acts."].) Because actual injury or loss is not an element of the offense, the trial court erred by dismissing counts 74, 89, 96 and 107 charging defendants with identity theft.

Neither defendant summarizes the evidence on these counts in any specific way. Purcell Johnson merely adopts the arguments made by Lavern Johnson that the alleged victims of the identity theft crimes suffered no financial or emotional harm or injury, and did not suffer any invasion of privacy. Defendants rely on *People v. Tillotson, supra,* 157 Cal.App.4th 517 to argue that some loss, even if not financial, is necessary to establish the crime of identity theft. In that case, the victim of the crime, a peace officer, was surveilled as a result of the use of his identifying information and obtained a permanent restraining order when he learned about its use. (*Id.* at p. 528.)

The contention is meritless. As defendants acknowledge, the issue in *People v. Tillotson, supra,* 157 Cal.App.4th 517 was whether the defendant's

use of the personal identifying information was unlawful; the appellate court upheld the identity theft conviction without addressing the question of whether injury or loss was necessary to sustain it. It is axiomatic that cases are not authority for propositions not considered. (*People v. Jennings* (2010) 50 Cal.4th 616, 684 [114 Cal.Rptr.3d 133, 237 P.3d 474].) Further, *Tillotson* supports the People's position that to sustain a conviction for identity theft under section 530.5 proof of actual injury or loss is not required. The fact the victim in *Tillotson* obtained a restraining order to prevent harm, or that the defendant in that case sought to cause harm, is not evidence of actual injury or loss to the victim stemming from the use of his personal identifying information.

## DISPOSITION

The order dismissing the Penal Code section 424, subdivision (a)(1) misappropriation of public moneys counts (counts 2, 5, 8, 11, 14, 17, 20, 23, 26, 29, 32, 35, 38, 41, 44, 47, 50, 53, 56, 59, 62, 65, 68 and 71) and the Penal Code section 530.5, subdivision (a) identity theft counts (counts 74, 89, 96 and 107) is reversed. The matter is remanded to the trial court with directions to enter a new and different order denying the motion to dismiss and for further proceedings according to law.

Nares, Acting P. J., and Irion, J., concurred.

On October 4, 2012, the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied January 16, 2013, S206415.