Filed 3/8/13  P. v. Rodriguez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

MIRIAM JEANNETTE RODRIGUEZ,

    Defendant and Appellant.

E053806

(Super.Ct.No. RIF149174)

OPINION

APPEAL from the Superior Court of Riverside County.  Harry A. Staley, Judge.

(Retired judge of the Kern Super. Ct. assigned by the Chief Justice pursuant to art. VI,

§ 6 of the Cal. Const.)  Affirmed with directions.

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and

Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, William M. Wood, and Marilyn L.

George, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Miriam Jeannette Rodriguez was found guilty by a jury of two counts

1

of elder financial abuse (Pen. Code,[1] § 368, subd. (d)), two counts of identity theft (§ 530.5, subd. (a)), nine counts of grand theft (§ 487, subd. (a)), one count of recording false documents (§ 115), four counts of residential burglary (§ 459), and 10 counts of money laundering (§ 186.10, subd. (a)), arising from a series of fraudulent mortgage transactions involving five separate victims.  Each of the victims was Hispanic and had difficulty understanding English.  All of the victims trusted the defendant, a real estate broker, to help them navigate through confusing loan modifications or mortgage refinancing, only to be bilked.  Defendant was sentenced to an aggregate term of 13 years 8 months, and appealed.

On appeal, defendant argues (1) the instructions on identity theft (counts 19 and 20) inadequately defined the element of unlawful purpose; (2) consecutive sentences on counts 24, 25, and 27 (the burglary counts), as well as on counts 7 and 9 (money laundering counts), violate section 654; (3) her presentence custody credit was miscalculated, entitling her to an additional three days of credit; and (4) the minute order and abstract of judgment must be amended to reflect the correct sentence.  The People agree defendant is entitled to additional presentence custody credit, and that the abstract should be amended.  We modify the judgment to stay the term for count 9, and accept the People's concessions on arguments 5 and 6, but otherwise affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

**BACKGROUND**

The defendant engaged in a series of fraudulent mortgage transactions, exploiting five Hispanic victims who depended on her knowledge of real estate lending practices, as well as her ability to read and comprehend English. Because an exhaustive explication of the facts is not necessary to our resolution of the issues presented, we briefly summarize what is otherwise a long and complicated history.

A.      **Faustina and Filiberto G.**

Faustina and Filiberto G. were elderly Mexican immigrants who had minimal education in Mexico and did not speak, read or write English. Faustina came to the United States in 1970, when she was 40 years old, while Filiberto was older than 40 when he came to this country. Filiberto had worked in a motor home factory in the past. In 2002, Filiberto and Faustina found a home through the defendant, who conducted business as a real estate broker under the business name Isis Realty, and purchased it for $71,000. By 2005, Filiberto was out of work due to health problems, although Faustina still worked as a seamstress. Filiberto's memory was already failing in 2005 and he depended on social security benefits because he did not have retirement benefits. Filiberto and Faustina wanted to refinance the home so their real estate taxes and insurance would be included in the mortgage payments, so they consulted defendant again.

Defendant told them it was not possible to have their taxes and insurance added to their mortgage payments, and recommended that they refinance the house, despite the fact that lending institutions do not require a refinance in order to do so. Defendant

3

advised Faustina to transfer her interest to Filiberto because she would not qualify, so Faustina executed a deed transferring her interest to her husband. The individual who notarized the documents was defendant's husband.

During this time frame, defendant borrowed money from Faustina and Filiberto on two occasions, which defendant paid back with interest. At some point, defendant had Faustino and Filiberto execute documents, but they did not know what they were signing. When they attempted to purchase a vehicle, they learned there was a line of credit. Faustina also noticed her mortgage statements included two amounts, one for the regular house payment, and the other for a loan. A $50,000 line of credit had been loaned in Filiberto's name, using the equity of their home. Filiberto had no recollection of the transaction and did not recognize the signature as his own. Defendant received $49,000 from that line of credit after Faustina unwittingly signed a withdrawal request in that amount. The application for the line of credit falsely stated that Filiberto worked as a restaurant manager earning $8,500 per month, when in fact he was only receiving social security benefits. The restaurant in question was operated by defendant's husband.

When Faustina and Filiberto confronted defendant with the line of credit, defendant said it was a loan to her and that she would repay it. Defendant instructed Faustina to give defendant the statements and that defendant would pay. Faustina and Filiberto received two installment payments from her, but the remainder of the balance on the line of credit was unpaid. Faustina's granddaughter made a report to law enforcement regarding the suspicious circumstances of the loan.

When Detective Negrete investigated the report made on behalf of Faustina and

4

Filiberto, he conducted a title search, where it was learned that a loan in the amount $188,000 had been made in Filiberto's name, but the proceeds of the loan had been transferred to defendant and her agent Carlos Colunga. Faustina was completely unaware that a loan transaction purportedly executed by Filiberto had been transacted by defendant in the amount of $188,000. Filiberto did not recall the loan and indicated that the signature on the papers was not his. Neither Filiberto nor Faustina executed a deed of trust for that loan that had been notarized by defendant's husband.

A search warrant served on the lender showed that $95,000 was wired in from Gateway Title. The next entry on the ledger showed that $86,744.56 was wire-transferred directly to Carlos Colunga, although Filiberto was named as the borrower; it is highly irregular and considered fraudulent for loan proceeds to be forwarded to a third party. Another red flag was the fact that the notary on the documents was not one approved by Lawyer's Title, the escrow company used for the loan.

A few days after that transfer, $6,600 was withdrawn, and a check paid to the order of defendant in the amount of $80,000 was paid by the bank to which the $86,744.58 was transferred. Another payment in the amount of $7,870 was disbursed to Isis Realty and Farmers Insurance.

B.   **Agripindo A. and Guadalupe S.**

Agripindo and Guadalupe were married and in 2005, the couple purchased a home using defendant's services. At the time of the home purchase, Agripindo worked in the construction industry. In November 2008, that job ended, and Agripindo began working in a factory. Neither Agripindo nor Guadalupe speaks, writes, or reads English.

5

In early 2008, when the amount of construction work decreased, Agripindo and Guadalupe began having difficulty meeting their house payments. They went to the defendant for help in lowering their payments. Defendant agreed to do so and charged the couple the amount of one month's house payment, or $2,915 (she ultimately charged them $1,900) as her fee. Defendant also instructed them to stop making payments for three months so she could process a loan modification. The defendant presented them with a contract written in English which she said was necessary for the loan modification, and they signed it, but did not retain a copy. The defendant then told Agripindo and Guadalupe that she needed money up front to start the process. They paid her $600 in cash shortly after signing the contract, and paid her another $300 in cash 15 days later. A week later, they paid her $1,000 in cash.

Agripindo and Guadalupe called frequently over the next three months to check the status of their loan modification. Defendant would report that she was working on it, but eventually she suggested a short sale. Defendant explained that in a short sale, she would get someone who was willing to let them use his or her name, but that Agripindo and Guadalupe would keep it; she also indicated she would find someone to sign for the house. In that way, Agripindo and Guadalupe would stay in the house, making the payments, and the proposed buyer would retransfer title to them on a later date.

On June 11, 2008, defendant asked for additional money. Guadalupe though it was strange that defendant requested cash so she took the cash her husband obtained and bought money orders. However, defendant requested that the money orders be left blank. Agripindo and Guadalupe provided three separate money orders in the amount of $1,000,

6

each, to the defendant, and a fourth money order in the amount of $200. Although they paid with money orders, defendant had requested cash. Approximately one month later, defendant told Agripindo and Guadalupe that she needed $3,200 more. The couple had only $1,000 left, however, so they gave her that amount. Eventually, they contacted the bank to find out if defendant was working on the loan. The bank officer informed them that they did not qualify for a loan modification and that the bank had not received any of the money paid by Agripindo and Guadalupe. The bank informed them that the house was in default.

Agripindo and Guadalupe then confronted defendant to find out what happened to the money. Although defendant informed them that the money had been sent to the bank, the post office that issued the money orders traced all of the money to defendant and Carlos Colunga. When they confronted her with the fact the bank never received the money, defendant got angry and said, "[A]ll [you] Mexicans are dumb shits."

At this point, Agripindo and Guadalupe demanded a return of all the money they had advanced, but defendant needed three weeks. In three weeks, however, defendant said she needed another 20 days, and when that time elapsed, defendant refused to repay them because the bank had taken the money. Agripindo and Guadalupe then contacted the police.

On July 15, 2008, a notice of default was issued and the property was sold in foreclosure. The bank had no entries that defendant or Isis Realty attempted to arrange a short sale. In April 2009, Agripindo and Guadalupe were evicted from the property and had to move in with Agripindo's brother.

7

**c.     Edelmira B.**

Edelmira B. immigrated to the United States from Mexico with her husband in 1989.  Edelmira had three years of college education in Mexico.  Edelmira's husband had been an accountant in Mexico, but in the United States he took whatever jobs he could get, including working in strawberry fields, construction, and driving a truck.   Edelmira and her husband owned two pieces of property and were current on their payments.  Neither of them could read English.

In 2008, Edelmira accompanied her nephew and his wife to an appointment with the defendant.  During that meeting, defendant asked Edelmira if she and her husband owned any property, and told Edelmira that there were government programs to lower payments.  Edelmira made an appointment to meet with defendant at the home of Edelmira's sister and brother-in-law.  Edelmira and her husband were just getting ready to make their next payment.

At the meeting, defendant told Edelmira that she and her husband should take advantage of the program, but informed them that in order to qualify for a loan modification, they had to be two months behind in payments.  Defendant charged them a fee of $2,500 to initiate the loan modification.  Defendant also told them that if they could not get a loan modification, she would arrange a short sale.  Defendant informed them that the short sale process involved them finding a person to qualify as a purchaser for a fictitious sale who would transfer title back to Edelmira and her husband after a

8

certain amount of time. Edelmira and her husband agreed to take on defendant's services; Carlos Colunga was present at the meeting. Edelmira gave defendant $2,000.[2] Edelmira and her husband signed paperwork that was written in English, presented by defendant, although neither could read English. Defendant did not provide them with copies of the documents so signed.

Subsequent to that meeting, when Edelmira and her husband were two months in arrears, defendant notified them that the bank had rejected the loan modification application. Defendant proposed doing the short sale instead. Edelmira and her husband went to defendant's office and signed an authorization to permit the defendant to proceed with the short sale. They also paid defendant the $500 balance on the original fee charged by defendant, as well as an addition $375 for an appraisal of the property.

After signing the paperwork, Carlos Colunga came to the residence of Edelmira and her husband on January 1, 2009, to pick up a check in the amount of $1,000, made out to Colunga. Defendant explained that the checks had to be made out to Colunga because as a real estate agent, she had to appear impartial, and if the checks were made out to her it would appear that she was helping them. The money was necessary to close the deal on the house, according to defendant. As the defendant explained, the money would be deposited into an account that belonged to her son, so that it could be deposited into an account for use by the third party who would purchase the property, an individual

---

[2] Defendant originally charged Edelmira $2,500, but only $2,000 was paid at the first meeting.

named Jose Alegria. Jose Alegria was the boyfriend of Edelmira's oldest daughter, who had agreed to act as the buyer of the residence in the short sale. Edelmira had Colunga write out a receipt for the check.

On January 3, 2009, defendant came to the home of Edelmira and her husband to pick up another check in the amount of $1,500. On January 21, 2009, Edelmira gave defendant another payment of $1,500. In February 2009, defendant informed Edelmira that the lender had questioned how Edelmira and her husband could make payments on their second residence and a car payment, but be unable to make their payments on this house. Defendant instructed Edelmira to stop making payments on the second house, which was rented out, as well as their car payments, so the lender could see they were behind in everything. Edelmira did as defendant suggested.

On February 17, 2009, Edelmira received a letter from the lender advising her of an impending auction of the property. Edelmira contacted defendant who told Edelmira not to worry because she could get three extensions from the bank. On March 5, 2009, defendant informed Edelmira that the escrow had raised the points on the short sale and that Edelmira and her husband would have to put up 3.5 percent. Defendant provided Edelmira with an account number, and Edelmira deposited the money as instructed.

Edelmira had one more contact with the defendant, when the defendant informed Edelmira to have Jose Alegria prepare for the closing of escrow, but was unable to contact the defendant after that. However, Aurora Loan Services (Aurora), which serviced the loan that Edelmira and her husband sought to modify, had no record of any contact by defendant, Carlos Colunga, or anyone from Isis Realty regarding a loan

10

modification. On October 3, 2008, Aurora received authorization to speak to Isis regarding the account of Edelmira and her husband, for the first time. Isis provided incomplete documentation on October 20, 2008, and the initial submission expired on January 20, 2009. The application was resubmitted in February but immediately expired because the submission was based on the same incomplete information that had been previously submitted.

In March 2009, Aurora received another submission from Isis, which included an expired purchase contract and required settlement statement, so that submission was inadequate as well. Aurora never approved a short sale on this loan. Additionally, Aurora would not require the seller in a short sale situation to submit money, other than a contribution for closing costs. Aurora never requested $1,000 on January 1, 2009, never made such a request on January 3, 2009, and did not request that any other funds be paid up front by Edelmira and her husband. In fact, Aurora never approved a short sale.

Edelmira, along with her husband and five children were evicted on May 17, 2009.

**d.      Henry M. A.**

Henry A. was a self-employed locksmith who immigrated to the United States when he was 15, in the late 1980's. He was married to Rosa G., who owns the locksmith business, although she primarily cared for the couple's children and only helped with the accounts of the business. In 2008, the family lived in Riverside with Henry's father, who is named Henry D. A. Henry's father worked cleaning houses, and the residence where the family lived was in the name of Henry's father.

11

In 2006, Henry M. A. was making payments on his father's residence because his father was not earning enough money. In 2008, Henry M. A.'s business dropped off and he had trouble making payments. He was worried about losing the home but had heard news stories about people getting help with loan modifications. After asking around, someone referred Henry M. A. to defendant, so he went with his wife to defendant's office. Defendant charged Henry M. A. $2,500 to do a loan modification, which he paid over a two-month period in installments.

In October 2008, defendant asked for another $2,000, explaining that a loan modification was not possible and a short sale was required. Defendant did not inform Henry M. A. that the house had already been sold in a foreclosure proceeding. Defendant explained to Henry M. A. that a short sale involved the house being sold to themselves. However, because Henry M. A.'s name was the same as his father, Henry M. A.'s wife Rosa G. would have to be the buyer because her surname was different.

The defendant informed Henry M. A. that the money for the down payment should come from a separate party. She requested that Henry M. A.'s uncle sign a letter that she drafted documenting that the uncle was making a gift of $9,544 to Henry M. A. as a down payment. However, Henry M. A. actually contributed a portion of the money. Later, Henry M. A. obtained a cashier's check, made out to Isis Realty in the amount of $9,544, and delivered it to the defendant. The cashier's check was required because defendant told Henry M. A. he could not use his own account in order to show the money had come from someone else.

12

Henry M. A. and his wife gave defendant their tax returns when applying for the loan modification. However, the tax returns submitted by defendant to the lender with the loan modification application showed the surnames of the children had been changed so they matched his wife's surname, a change not made by Henry M.,A. or his wife. After giving defendant the payment, defendant told Henry M. A. to wait. Henry M. A. was unaware that on December 16, 2008, the home had been sold.

At some point after December 16, 2008, Henry M. A. asked defendant for proof that she was working on the short sale. Defendant provided a document showing that the loan for the proposed short sale buyer had been preapproved. The letter, which was written on outdated letterhead of Production Mortgage, contained the signature of Patricia O., an underwriter of Production Mortgage, and was dated January 13, 2009. However, the person whose name appears as the underwriter did not write or sign the letter of approval.

The Production Mortgage file showed that a purchase contract dated December 2, 2008, had been submitted to Production Mortgage showing Rosa G. as buyer, Henry D. A. as seller, Isis Realty as realtor-broker, and Carlos Colunga and defendants as agents. However, Production Mortgage had canceled the proposed short sale and informed the broker-agent (defendant) that the ratio was too high. Production Mortgage noticed that Rosa G. had paperwork from a collection company in the name of Rosa A., and that the A. name appeared on tax returns as the surname of Rosa's children. The records of Production Mortgage reflected that it considered the deal to be a "bailout" and that it was suspected that the buyer and seller were related. When Henry M. A. contacted

13

Production Mortgage, his father's lender, about the preapproval, he was instructed to contact defendant. However, the defendant could not be found.

EMC Mortgage Corporation serviced the loan on the home of Henry D. A. The account history for the loan showed that Carlos Colunga had contacted the lender inquiring about a short sale on September 9, 2008. The short sale was initially approved after the bank completed its financial analysis and determined it would accept a short payoff. The next step was to receive a final HUD approval so closing could occur. However, EMC never received this approval. The foreclosure sale was postponed in November, but when the closing did not occur by the deadline, the foreclosure sale went forward. Additionally, if EMC had known that the proposed purchaser in the short sale was married to the son of the borrower, it would have shut the file down.

Subsequently, Henry M. A. and his family received an eviction letter.

**Procedural History**

Defendant was charged by information with multiple offenses. In counts 1 and 2, she was charged with elder financial abuse respecting Filiberto and Faustino G. (§ 368, subd. (d)); counts 3, 11, 15, 16, 18, 21, 23, 26, and 28 charged her with grand theft respecting Works Savings Bank, Wachovia Mortgage Corporation, Agripindo A., Henry A., and Edelmira B., (§ 487, subd. (a)); count 4 alleged she recorded a forged document (§ 115.5, subd. (a)); counts 5, 6, 7, 8, 9, 10, 12, and 13 charged defendant with money laundering (§ 186.10, subd. (a)); counts 19 and 20 alleged identity theft of Patricia O.

(§ 530.5, subd. (a)); and counts 22, 24, 25, and 27 charged residential burglary.[3]  (§ 459.)

The information also included quantity enhancements as to counts 1 and 2 (§ 12022.6, subd. (a)(2)), and counts 5, 7, and 9 (§ 186.10, subd. (c)(1)(a)), and the burglary counts included an allegation that another person, not an accomplice, was present at the time the burglaries were committed.  (§ 667.5, subd. (c)(21).)

Defendant was tried by a jury and convicted of all counts, save those dismissed by the People.  At sentencing, the court denied probation and selected count 22 as the principal term.  The court imposed the midterm of four years for count 22, and imposed consecutive terms (one-third the midterm) for counts 1, 5, 7, 9, 15, 18, 24, 25 and 27, along with one-third the term for any enhancements.  For counts 3, 6, 8, 10, 11, 12, 13, 16, 19, and 20, the court imposed concurrent midterm sentences, and the court stayed terms on counts 2, 21, 23, 26 and 28, pursuant to section 654.

Defendant timely appealed.

## DISCUSSION

1.  **The Instruction Defining the Elements of Identity Theft (§ 530.5, Subdivision (a)) Is Proper.**

Defendant argues her convictions for identity theft in counts 19 and 20 must be reversed because the trial court failed to define "unlawful purpose," as part of the mental

---

[3] The information also included count 14, charging that defendant received or possessed stolen property respecting the home equity line of credit of Filiberto G. (§ 496, subd. (a)); and count 17, in which it was alleged defendant fraudulently induced Henry A. to sign a contract, in violation of Civil Code section 2945.4, subdivision (g).  However, these counts were dismissed on motion by the People at the close of its case in chief.

element of section 530.5, subdivision (a). We disagree.

It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.) The language of a statute defining a crime is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1014.)

The elements of section 530.5 include: (1) that the person willfully obtain personal identifying information belonging to someone else; (2) that the person use that information for any unlawful purpose; and (3) that the person who uses the personal identifying information do so without the consent of the person whose personal identifying information is being used. (*People v. Barba* (2012) 211 Cal.App. 4th 214, 223, citing *In re Rolando S.* (2011) 197 Cal.App.4th 936, 940, and *People v. Tillotson* (2007) 157 Cal.App.4th 517, 533.)

CALCRIM No. 2040, the CALCRIM instruction that pertains to this offense, sets forth the elements of the offense in section 530.5, subdivision (a), as follows:

"The defendant is charged [in Count _____] with the unauthorized use of someone else's personal identifying information in violation of Penal Code section 530.5[, subdivision] (a).

16

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant willfully obtained someone else's personal identifying information;

"2. The defendant willfully used that information for an unlawful purpose;

"AND

"3. The defendant used the information without the consent of the person whose identifying information she was using."

As can be seen from the above, "unlawful purpose" is not the "mental element" of the statute. The term is only used in the statute to describe the defendant's "use" of information "willfully obtained." The requisite mental state for the crime was defined in CALCRIM No. 252, with which the court properly instructed the jury.

CALCRIM No. 2040 correctly instructs the jury on the elements of the crime. Defendant's claim is not that the instruction omits any element of the crime, but, rather, that the instruction fails to clarify the term "unlawful purpose" as it is used in the statute. Generally, when a party complains that an instruction is too general, lacks clarity, or is incomplete, he must request the additional or qualifying instruction in order to have the error reviewed. (*People v. Welch* (1999) 20 Cal.4th 701, 757, citing *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1162.)

When a word or phrase is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request. (*People v. Estrada* (1995) 11 Cal.4th 568, 574, quoting *People v. Rowland* (1992) 4 Cal.4th 238,

17

270-271.) Further, a trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel. (*People v. Lee* (2011) 51 Cal.4th 620, 638, citing *People v. Kelly* (1992) 1 Cal.4th 495, 535.) Failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal. (*People v. Rundle* (2008) 43 Cal.4th 76, 151, disapproved on a different point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163.)

We may review the claim of error despite the failure to preserve such an issue for appeal of instructional error; to the extent a defendant's substantial rights were affected. (§ 1259; see *People v. Rundle, supra,* 43 Cal.4th at p. 151, disapproved on another point in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.) In determining the correctness of jury instructions, we consider the instructions as a whole. (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1061.) An instruction can only be found to be ambiguous or misleading if, in the context of the entire charge, there is a reasonable likelihood that the jury misconstrued or misapplied its words. (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1237, citing *People v. Frye* (1998) 18 Cal.4th 894, 957, disapproved on a different point in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

In order to violate section 530.5, subdivision (a), a defendant must both (1) obtain personal identifying information, and (2) use that information for an unlawful purpose. (*People v. Tillotson, supra,* 157 Cal.App.4th at p. 533.) Thus, it is the use of the identifying information for an unlawful purpose that completes the crime and each separate use constitutes a new crime. (*People v. Mitchell* (2008) 164 Cal.App.4th 442,

18

455.)  The statutory language of section 530.5, subdivision (a), has been held to be sufficiently clear, not requiring an intent to defraud as a prerequisite for a conviction under that portion of section 530.5.  (*People v. Hagedorn* (2005) 127 Cal.App.4th 734, 748 [holding that the jury was properly instructed on the elements of the offense charged using CALCRIM No. 2040].)

In dicta, the reviewing court in *People v. Hagedorn, supra,* observed that, standing alone, the phrase "'uses . . . for any unlawful purpose'" might be considered unconstitutionally vague under particular circumstances, because persons of common intelligence might have to guess at its meaning and could differ as to its application."  (*People v. Hagedorn, supra,* 127 Cal.App.4th at p. 746.)  However, the court went on to state that "the statute goes on to define 'uses . . . for any unlawful purpose' as including the obtaining, or attempted obtaining, of 'credit, goods, services, or medical information in the name of [an]other person without the consent of that person . . . .'"  The court did not hold that term "unlawful purpose" was ambiguous, requiring special instructions, and its holding does not support defendant's assertion that a trial court is required, sua sponte, to define the term "unlawful purpose."  In our view, the term "unlawful purpose" is a term commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law.

Here, In order to obtain additional money from Henry A., defendant had falsely represented that the loan modification had been approved, and used the personal identifying information of Patrica O. and Production Mortgage to induce Henry A. to come up with additional cash.  In recreating the letterhead of Production Mortgage,

19

defendant used its identifying information from an outdated letter, as well as the name and underwriter information of Patricia O. In creating the false approval letter, defendant could not have been acting by mistake or unintentionally. In using the information to defraud Henry A. out of additional funds which the lender denied requesting, in the name of the other person without the consent of that person, her purpose can be nothing but unlawful. (See *People v. Hagedorn, supra*, 127 Cal.App.4th at p. 747.)

Because ignorance of the law is no excuse for a violation thereof (*People v. Hagedorn, supra*, 127 Cal.App.4th at p. 748), defendant may be presumed to know that using the identity of another, without consent to use it, to fraudulently induce a third party to pay her money to which she was not otherwise entitled; no further explanation of "unlawful purpose" was required.

## 2. Consecutive Terms for the Burglaries in Counts 24 and 25 Were Proper Where There Were Separate Entries on Separate Occasions, and Separate Takings By False Pretenses.

Defendant argues that consecutive sentences for the burglaries charged in counts 24, 25, and 27 violated the multiple punishment prohibition found in section 654, since all were part of an indivisible course of conduct. We disagree.

Section 654 bars multiple punishments for separate offenses arising out of a single occurrence where all of the offenses were incident to one objective. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1368, citing *Neal v. State of California* (1960) 55 Cal.2d 11, 19.) A course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn.

20

11.)  This is particularly true where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.  (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1289, citing *People v. Gaio* (2000) 81 Cal.App.4th 919, 935.)

In the present case, the burglaries reflect three separate entries into the home of Edelmira B., with the felonious intent of defrauding Edelmira of separate sums of money. Although there may have been one overarching criminal scheme, they were committed on different days.  (See, e.g., *People v. Andra* (2007) 156 Cal.App.4th 638, 640-642 [identity theft committed to facilitate a vehicle theft and to obtain money by false pretenses did not implicate section 654, because the identity theft occurred prior to the other crimes]; *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1256 [burglary to facilitate commission of crimes nine days later not subject to § 654]; *People v. Williams* (1988) 201 Cal.App.3d 439, 442 [burglary to obtain jewels to facilitate solicitation of murder months later not subject to section 654 although part of overarching scheme].)

In our view, the defendant had the opportunity to reflect and renew her criminal intent prior to the commission of the second and third burglaries.  As separate crimes committed on separate occasions, the court had the discretion to impose separate sentences.

**3.  Section 654 Requires a Consecutive Term on Count 7, But Requires a Stay of Count 9.**

Defendant argues that the cashier's check for $80,000, which is the subject of

21

counts 7 and 9, were part of an indivisible course of conduct derived from the original single wire transfer to Carlos Colunga in the amount of $86,744.56. As such, she argues that the consecutive terms for both counts were barred by section 654 and that both terms should have been stayed. We disagree.

As discussed in the previous section, section 654, subdivision (a), bars multiple punishment not only for a single criminal act but for a single indivisible course of conduct in which the defendant had only one criminal intent or objective. (*People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603, citing *People v. Bauer* (1969) 1 Cal.3d 368, 376.) If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. (*People v. Conners* (2008) 168 Cal.App.4th 443, 458.)

However, as we also pointed out, a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. (*People v. Beamon, supra,* 8 Cal.3d at p. 639, fn. 11; see also *People v. Kwok, supra,* 63 Cal.App.4th at pp. 1253-1254.) If the offenses were committed on different occasions, they may be punished separately. (*Kwok,* at p. 1253.) Thus, where the offenses are temporally separated, affording the defendant an opportunity to reflect and to renew her intent before committing the next offense, multiple punishment is permitted. (*People v. Gaio, supra,* 81 Cal.App.4th at p. 935.)

Here, count 5 relates to the wire transfer from the escrow account to the bank account of Carlos Colunga in the amount of $86,744.56. Count 7 refers to the cashier's check in the amount of $80,000 withdrawn from the account of Carlos Colunga, and

22

count 9 relates to the deposit of those funds into the defendant's account. Because the defendant had the opportunity to reflect and renew her intent between the deposit of the wire transfer into Colunga's account and the act of obtaining the cashier's check in the amount of $80,000 payable to herself, the court had discretion to sentence the defendant separately for the cashier's check.

Defendant relies on the holding of *People v. Conners, supra,* 168 Cal.App.4th 443, as support for her position that both counts 7 and 9 should be stayed. However, in *Conners,* the defendant was charged with a single count of money laundering and a single count of receiving stolen property relating to the receipt and cashing of several stolen checks. The issue in that case was whether the defendant could be separately punished for receiving stolen property based on the same act that was the subject of the money laundering. The court concluded that the evidence showed he harbored a single intent: to receive the stolen funds. (*People v. Conners, supra*, 168 Cal.App.4th at p. 458.) The *Conners* case is distinguishable from the present case where the act alleged in count 5 (the wire transfer of funds into the account of Carlos Colunga) is a separate act occurring on a date different from the cashier's check payable to the defendant's order.

However, both counts 7 and 9 relate to the same cashier's check, made payable to the order of the defendant. As such, counts 7 and 9 were part of the same indivisible course of conduct, and the sentence for one of two counts should have been stayed pursuant to section 654. We therefore modify the sentence to stay the term for count 9, as well as the enhancement thereto.

23

## 4. Concurrent Terms for Counts 19 and 20, Identity Theft, Did Not Violate Section 654.

Defendant claims that the concurrent sentences imposed for counts 19 and 20 are barred by section 654. We disagree.

We have previously discussed the principles embodied in section 654. We also acknowledge that section 654 is violated as much by concurrent sentences as by consecutive terms. (*People v. Deloza* (1998) 18 Cal.4th 585, 594-595.) An exception to the applicability of section 654 is made where a crime of violence is committed against more than one victim. (*People v. Williams* (1992) 9 Cal.App.4th 1465, 1473, citing *Neal v. State of California, supra,* 55 Cal.2d at pp. 20-21.) However, where the offenses arising out of the same transaction are not crimes of violence but involve crimes against property interests of several persons, only a single punishment is permissible. (*Williams,* at p. 1473, citing *People v. Bauer, supra,* 1 Cal.3d at p. 378.) The crux of the issue is whether identity theft is a crime involving "property interests."

Section 530.5 penalizes the acts of obtaining personal identifying information of another person and using that information to obtain or attempt to obtain credit, goods or services in the name of the other person without their consent. (*People v. Valenzuela* (2012) 205 Cal.App.4th 800, 806.) Identity theft involving possession of personal identifying information relating to different victims may be separately charged and result in separate convictions. (*Id.* at p. 808.)

Actual injury or loss is not an element of the offense. (*People v. Johnson* (2012) 209 Cal.App.4th 800, 818.) Section 530.5, subdivision (a), is committed each time an

24

offender uses personal identifying information for any unlawful purpose. (*People v. Mitchell*, *supra*, 164 Cal.App.4th at p. 457.) Section 530.5 addresses disruptions caused in victims' lives when their personal identifying information is used, even if those victims may not have been financially harmed as a result of a defendant's conduct. (*People v. Barba* (2012) 211 Cal.App.4th 214, 226, citing *People v. Valenzuela, supra,* 205 Cal.App.4th at p. 808.)

We have not found and neither party has pointed us to any case in which the identities of two victims were appropriated in a single document. Nevertheless, there were two victims of the identity theft. Each identity was appropriated for a different but related purpose: the use of the letterhead of Production Mortgage was used to induce Agripindo A. to believe his application had been officially approved by his lender, which, in turn, induced him to trust defendant's representations requiring the payment of funds. The use of Patricia O.'s identity as the purported underwriter and signator of the letter furthered this purpose. The two violations were part of an indivisible course of conduct but impacted each victim in a unique and individual way.

Ordinarily, where a crime involves property interests, the fact that separate violations were part of an indivisible course of conduct would preclude multiple punishment. (*People v. Williams, supra,* 9 Cal.App.4th at p. 1473.) However, identity theft does not implicate property interests and the consequences to the respective victims were significant and unique to each. No published cases have addressed the applicability of section 654 to multiple identity thefts.

25

We conclude that separate punishment for the misappropriation of the identifying information of multiple victims is permissible. Each victim suffered a violation of integrity, reputation and reliability. To apply section 654 would ignore the extent of the unique injury to each victim's reputation, resulting in a windfall to a defendant. Here, the use of both identities was critical to the defendant's goal. The use of the Production Mortgage letterhead alone may or may not have successfully persuaded Agripindo A. to part with more money at the defendant's request. Thus, it was necessary for defendant to co-opt the identity of an underwriter to seal the deal. In such circumstances, where defendant does not challenge the factual basis for the court's imposition of concurrent sentences, and where each victim suffered unique injury, we can find no error.

## 5. Defendant is Entitled to Three Additional Days of Presentence Custodial Credit.

Defendant asserts her presentence custody credits were incorrectly calculated. The People agree that defendant is entitled to three additional days of presentence credit. We agree. The clerk of the superior court will be directed to amend the sentencing minutes and the abstract of judgment to reflect that she earned 804 days credit for time actually spent in presentence custody, and 120 days of conduct credit, for total presentence custody credit in the amount of 924 days.

## 6. Errors in the Minutes and Abstract of Judgment Should Be Corrected.

Defendant asserts the clerk incorrectly recorded his sentence in the minutes and on the abstract of judgment. Specifically, she notes that in the oral pronouncement of judgment, the court imposed consecutive one-third middle terms for counts 5 and 7, but

that the minute order and abstract reflect full consecutive sentences of two years on each count.  Additionally, she notes that although the court imposed consecutive one-third middle terms for counts 25 and 27, the minutes and abstract of judgment reflect concurrent terms for those counts.  The People agree that these clerical errors should be corrected.  We agree that the clerk's minutes of the sentence and the abstract of judgment do not conform to the oral sentence.

The abstract of judgment constitutes the commitment and is the order sending the defendant to prison, and the process and authority for carrying the judgment and sentence into effect; no other warrant or authority is necessary to justify or require its execution. (§ 1213; *People v. Mitchell* (2001) 26 Cal.4th 181, 185, citing *In re Black* (1967) 66 Cal.2d 881, 890.)  The "abstract is a contemporaneous, statutorily sanctioned, officially prepared clerical *record* of the conviction and sentence."  (*People v. Delgado* (2008) 43 Cal.4th 1059, 1070 [emphasis by court].)  "When prepared by the court clerk, at or near the time of judgment, as part of his or her official duty, it is cloaked with a presumption of regularity and reliability."  (*Ibid.*, citing Evid. Code, §§ 660, 664, 1280.)  It should go without saying that accuracy is essential in a document that prescribes the execution of sentence to the Department of Corrections and Rehabilitation (CDCR) and to which a criminal investigation and identification number is assigned for interagency use.  (§ 1213, subd. (a).)

For those persons committed to state prison, the CDCR relies on the information contained in the abstract to determine the defendant's release date, as well as to determine where the defendant should be housed, based on a classification score

27

determined in reliance on the information about the conviction contained in the abstract. (See 15 Cal. Code of Regs. §§ 3075 [initial intake], 3077 [criteria for County Assessment Program], 3078.3 [criteria for Alternative Custody Program Exclusion], 3269 [criteria considered for inmate housing assignments], 3375 [classification process], 3375.1 [inmate placement based on classification score].) Erroneous information on the abstract of judgment can result in errors in the defendant's classification score. With thousands of inmates received by CDCR for processing and classification, misplaced information on an abstract of judgment can result in errors or the unnecessary consumption of time on the part of CDCR.

This court has the authority to correct clerical errors at any time. (*People v. Mitchell, supra*, 26 Cal.4th at pp. 186-187.) The clerk is directed to amend the minutes of the sentencing and the abstract of judgment to reflect the following: (a) consecutive terms of eight months each on counts 5 and 7, respectively; (b) consecutive terms of one year eight months each on counts 25 and 27, respectively.

## DISPOSITON

The sentence is modified to stay the term of eight months for count 9, along with the four-month term imposed for the enhancement to count 9. In addition, we direct the clerk of the superior court to amend the sentencing minutes and the abstract of judgment to conform to the oral pronouncement of judgment as set forth in section 6 of

this opinion, and include the modification to count 9, and to forward a copy of the amended abstract to the CDCR. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

28

RAMIREZ
P. J.

We concur:

RICHLI
J.

MILLER
J.