Filed 12/27/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br>v.<br><br>YAHOR ZGURSKI,<br><br>      Defendant and Appellant. | A160525<br><br>(City & County of San Francisco<br>Super. Ct. No. SCN226691) |

In 2018, a jury convicted Yahor Zgurski of using the personal identifying information of another person for an unlawful purpose. (Penal Code, § 530.5, subdivision (a) (section 530.5(a)); undesignated statutory references are to the Penal Code.) The trial court reduced Zgurski's felony conviction to a misdemeanor and placed him on probation for three years.

On appeal, Zgurski contends there is insufficient evidence to support his conviction. He also contends that his probation term must be reduced to one year pursuant to a recent amendment to section 1203a, but in his reply brief, Zgurski acknowledges that this part of his appeal is moot. We affirm the judgment.

**BACKGROUND**

**I. Prosecution Evidence**

Zgurski came to the attention of the San Francisco District Attorney because of his involvement in a scheme to defraud consumers who used the internet to purchase a boat from a person ostensibly called Joshua Eisenberg.

1

## A. The Boat Fraud Scheme

In May 2014, Michael C. wanted to buy a boat, looked on eBay, and was directed to another internet site where he found a boat for sale that interested him. Michael sent an email inquiry to Joshua Eisenberg, who was listed as the boat owner.[1] The two exchanged emails and spoke on the phone. Eisenberg offered to deliver the boat to Michael, who lived in New York. He told Michael that he would set up an escrow account in California with a company called ITRADER Global. Michael was to deposit money into that account and then, once the boat was delivered, Michael would call the escrow company and the funds would be released to Eisenberg. They negotiated a sale price of $30,500.

In June 2014, Michael instructed his bank to complete a wire transfer of funds to the account designated by Eisenberg. Eisenberg confirmed the transfer and sent Michael a certificate of title that appeared genuine. When Michael received confirmation of the transfer from his bank, it reflected that the money was sent to a bank account in California, but the beneficiary was GV National Trading Services rather than ITRADER Global. The boat was never delivered. Michael tried to contact Eisenberg with no success.

Meanwhile, in May 2014, Steve B. was living in Ohio when he attempted to buy a boat listed on eBay but was outbid. A few days later, Steve received an email from Josh Eisenberg, who said that the sale of the boat that Steve bid on fell through and inquired if Steve was still interested in buying it. After further discussion over email, they agreed on a sale price of $23,500.

---

[1] "Joshua Eisenberg" is here a fictitious person, but we omit the last names of real individuals who were victims of this fraud scheme to protect their privacy.

Eisenberg told Steve that he wanted to use a third-party service he had used in the past called ITRADER Global. Eisenberg said that service would hold Steve's money until Eisenberg delivered the boat and Steve had the opportunity to look it over and make sure he was happy with it. Steve set up an account at ITRADER Global and authorized his bank to wire money to the account. Eisenberg sent Steve an email confirming that the money had been transferred and the boat would be delivered to Steve. When Steve received confirmation of the wire transfer from his bank, he learned that the money was wired to GV National Trading Services. The boat was never delivered to Steve and Eisenberg did not respond to calls or emails.

**B. The Fraud Investigation**

The district attorney in Suffolk County, New York began an investigation of the Eisenberg fraud scheme after Michael C. filed a complaint. The bank account that was used to defraud Michael C. and Steve B. was located in San Francisco at the West Castro branch of Bank of the West. It was opened in January 2014 and closed in July 2014, and the account holder was Alexander B. doing business as GV National Trading Services. For ease of reference, we will refer to this account as the GV National account.

The Suffolk district attorney's office contacted the San Francisco district attorney, and the Eisenberg fraud case was assigned to Pollie Pent, an inspector on the high-tech crimes task force. Pent obtained records pertaining to the GV National account from Bank of the West, which showed that Michael C. and Steven B. wired money into this account, and that money was wired from this account to a woman in Russia. Pent also obtained still photographs of a man at the bank conducting business in the account.

Through her investigation, Pent learned that the man who opened the GV National account used a Pennsylvania license, which contained Alexander B.'s name and an identification number for a valid driver's license belonging to a man named Loni P. Pent used this information to conduct a "deconfliction," which is a database search of an "Intelligence Clearinghouse" of ongoing fraud investigations to determine if other agencies are looking at the same information. The driver's license number used to open the GV National account was connected to a man named Vadzim Klimasheuski, who was the "target" of an FBI investigation in South Florida that involved bank fraud, drugs and weapons.

After additional research, Pent discovered that the name Alexander B. was also associated with the South Florida fraud investigation of Klimasheuski. Pent contacted Alexander B., who later testified at Zgurski's trial. Alexander B. reported that he did not open the GV National account or any other bank account on the West Coast. Nor did Alexander B. give anybody permission to use his name to open the GV National account or have any knowledge about a company called GV National Trading Services.

Pent found a "Facebook" page for Vadzim Klimasheuski, which led her to Zgurski, who was identified as a friend of Klimasheuski. Zgurski was easily recognizable as the man in the bank photographs conducting transactions in the GV National account. A Bank of the West employee also identified Zgurski as the man who opened the GV National account using the name Alexander B.

Through further investigation, Pent discovered that Zgurski and Klimasheuski were neighbors living on the same cul-de-sac in San Francisco. A phone record search showed that calls perpetrating the fraudulent boat

4

transactions originated within a 25-meter radius of a location between the homes of these two men.

## C. Zgurski's Arrest and Interview

In February 2015, Zgurski was arrested and interviewed by Pent and an FBI special agent who was involved in the South Florida fraud investigation. At the outset of the interview, Zgurski waived his *Miranda* rights and stated that he wanted to talk to the investigators. Zgurski was provided the assistance of an interpreter, which he did not use. The interview was recorded and admitted into evidence at Zgurski's trial.[2]

Before asking questions, Pent stated that Zgurski had been arrested for conducting banking transactions in an account that people used to attempt to buy boats. Pent said she had evidence that Zgurski had gone into the account, withdrew money, and then wired the rest of the money to a woman in Russia. Zgurski denied doing those things, and also denied opening an account at Bank of the West in January 2014. Pent showed Zgurski several photographs that had been taken at Bank of the West. Zgurski grinned as he confirmed that he was the person in the photographs. Pent also told Zgurski that bank employees had identified him as the person who opened the account. Then Zgurski admitted that he opened the GV National account in January 2014. He told the officers that he "did it" because he "needed . . . some money."

Zgurski said he did not use his own name to open the account because it was supposed to be in somebody else's name. He claimed not to remember what name he used, but he admitted that he did not know that person. Both officers pressed Zgurski to explain how he got the name that he used to open

---

[2] Video exhibits of Zgurski's interview were transmitted to this court pursuant to our own motion. (Cal. Rules of Court, Rule 8.224(d).)

the account. Pent asked how Zgurski got the information of a person who he did not know, stating that this "guy does exist" and that he is "mad" because his name has been "flagged" by the authorities. Zgurski did not respond to Pent's question. When the FBI agent asked again how Zgurski got the name, Zgurski asked if he could "not answer" this particular question. Pent told him that he did not have to answer, reminding him of his *Miranda* rights. (See *Miranda v. Arizona* (1966) 384 U.S.436.)

After a pause, Zgurski said "okay," and then told the officers that his friend, Vadzim Klimasheuski, told him that he could make some money if he opened an account at Bank of the West in San Francisco and used the account to send money to Russia. In exchange for these services, Klimasheuski paid Zgurski $1000. Klimasheuski told Zgurski not to use his own name and gave him the ID to open the account. Zgurski admitted that he supplied a photo of himself and Klimasheuski gave him the ID a few weeks later. Zgurski did not know the purpose of the account or ask Klimasheuski any questions about the name on the ID. The ID was a Pennsylvania driver's license because that made things easier. The only question Zgurski asked was whether his role would be dangerous. Klimasheuski said there was no danger and not to worry.

Zgurski acknowledged that he opened the account in the name of Alexander B. He also confirmed that the account was opened in the name of a company, but he did not know why that name was used. Klimasheuski gave him the information to open the account, including the company name, the account holders' phone numbers and their address. Klimasheuski told him to go to Bank of the West but did not tell him what branch. The first branch Zgurski went to was not able to open the account because of a computer problem, so he went to the Castro branch.

The FBI inspector asked Zgurski what happened to the ID. Zgurski explicitly denied giving it back to Klimasheuski. He said that he threw it away because he did not need it anymore and it was not good to have something like that around. Pent suggested that Zgurski threw the ID away because he did not want to get caught with it and Zgurski agreed.

Zgurski said that Klimasheuski paid him cash after he completed the bank transactions transferring funds to Russia. In response to a question whether Klimasheuski was a good business partner, who did what he said he was going to do, Zgurski answered yes. Zgurski repeatedly denied asking Klimasheuski anything about the purpose of the transactions. He disagreed with the inspectors that he was too smart not to ask questions. Pent said Zgurski was smart enough to get away with impersonating Alexander B. and repeated that poor Alex B. could not leave the country because he was "on a hold."

Zgurski told the officers that he met Klimasheuski because they were both from Belarus, arrived in America around the same time, and became roommates. When Klimasheuski approached Zgurski about the bank proposal, they were no longer roommates. Klimasheuski just approached him one day and asked if he wanted to make some extra money. Zgurski did not want to do the job but he needed money. Zgurski told the officers that he no longer had a relationship with Klimasheuski. They were neighbors, living on the same court, but they would only say hello in passing. Nothing happened between them, they just had different lives.

The FBI agent emphasized the seriousness of the situation and said they had put all their cards on the table so that Zgurski would do the same. Pent asked if Zgurski was "worried at all" about the consequences of sharing information or about his "safety." Zgurski responded that he was not

7

worried. The FBI agent asked if Zgurski was interested in helping himself and Zgurski said he was. The agent asked if Zgurski would talk to Klimasheuski, ask him questions about the case, and record his answers. When Zgurski appeared hesitant, Pent asked if he was concerned or afraid that if he recorded Klimasheuski and Klimasheuski found out and got in trouble, then someone might try to do something to Zgurski, like damage his car. Zgurski responded yes.

During another part of the interview, the FBI agent spoke to Zgurski alone. Zgurski said he wanted to cooperate and he would do everything the agent wanted him to do. The agent asked if Zgurski had any other information about Klimasheuski, the IDs, or anything else. Zgurski said he had not been interested in the scheme and never asked any questions other than whether his role would be dangerous.

Despite his offer to help, Zgurski did not assist with the investigation of the Eisenberg boat fraud scheme or Klimasheuski's other activities.

## II. Zgurski's Defense

At trial, Zgurski called two witnesses who testified that Zgurski is honest and trustworthy. Then Zgurski testified in his own defense, providing details about his background and involvement with Klimasheuski and the boat fraud scheme.

Zgurski was born in Russia and raised in Belarus, where life was difficult because of corruption and the prominence of gangsters. As a young person, Zgurski was often attacked and beaten by random people. He took a break from college to serve in the army where he was beaten by "Elder soldiers," probably because of his political activities. As a result of that trauma, Zgurski has problems with his memory. In 2010, he came to America on a student program and moved to Treasure Island where people

from his country offered him a place to live. He had trouble understanding English, although his skills improved by the time he testified at trial.[3] He was granted political asylum in 2013.

When Zgurski first moved to Treasure Island, he shared an apartment with five other people from Belarus, including Klimasheuski. By coincidence, Klimasheuski had arrived in the country the day before Zgurski and Zgurski tried to become his friend. They obtained their driver's licenses together, they worked together for a moving company, and they got jobs driving for Super Shuttle. However, Zgurski noticed that living in America changed Klimasheuski; he got in fights, got involved with guns, and people were afraid of him. By 2014, Zgurski was also afraid of Klimasheuski, but even before then, Zgurski moved to a different home because he did not like Klimasheuski.

Zgurski testified that he participated in Klimasheuski's banking scheme because he had money problems. Initially, Zgurski stated that he did not recall how Klimasheuski knew about his money problem. Later, he testified that Klimasheuski loaned him $1,000, which he could not pay back. Klimasheuski told Zgurski that he could make some money if he was willing to "open an account in a bank and transfer money." Klimasheuski said they would be using his money so it would not be stealing. Initially, Zgurski agreed to do this, but then people told him not to, so he changed his mind and refused. But Klimasheuski pressured him with violence and threats. At one point he put Zgurski in a headlock, and he also threatened Zgurski's family in Belarus. A few months after Klimasheuski made his proposal, Zgurski accepted it.

---

[3] Zgurski waived his right to the assistance of an interpreter at trial.

In January 2014, Zgurski opened an account at the Bank of the West in San Francisco by using a Pennsylvania driver's license bearing his picture and the name Alexander B. Klimasheuski provided the ID and told Zgurski that the person's name on the card was "not [an] existing person so just made up." For several months after Zgurski opened the account, he did not have much contact with Klimasheuski. Zgurski could not recall if he was even living on Treasure Island during that period. Then one day Klimasheuski gave Zgurski instructions to transfer money from the GV National account to an account in Russia. Zgurski went into the bank to make withdrawals and to arrange for the wire transfer to Russia. To conduct these transactions, Zgurski used an ATM bank card and the ID card bearing his picture and the name Alexander B. According to Zgurski, Klimasheuski had kept both cards in his possession and only gave them to Zgurski when he wanted a transaction to happen. Zgurski admitted telling Inspector Pent that he got "rid" of the ID card, but at trial he claimed that was a miscommunication, as he meant to say that he gave the card back to Klimasheuski.

Zgurski testified that he did not tell the investigators that Klimasheuski threatened him and made him participate in the banking scheme because he was afraid Klimasheuski would find out. According to Zgurski's trial testimony, Klimasheuski was a dangerous and violent person. At trial, Zgurski was able to testify about his fear and Klimasheuski's threats because a lot of time had passed and Klimasheuski no longer lived in the United States.

## III. Charged Offenses and Jury Verdicts

In September 2018, Zgurski was tried on three felony charges: willful use of the personal information of another person for an unlawful purpose, on or about January 10, 2014 (§ 530.5(a)); grand theft of Steven B.'s personal

10

property on June 4, 2014 (§ 484); and grand theft of Michael C.'s personal property on June 9, 2014 (§ 484).

The trial court instructed the jury regarding the section 530.5(a) charge by giving a modified version of CALCRIM No. 2040, which stated:

"Mr. Zgurski is charged in Count 1 with the unauthorized use of someone else's personal identifying information in violation of Penal Code Section 530.5(a). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant willfully obtained someone else's personal identifying information; [¶] 2. The defendant willfully used that information for an unlawful purpose; [¶] AND [¶] 3. The defendant used the information without the consent of the person whose identifying information he was using.

"Personal identifying information means any state or federal driver's license, savings account number, checking account number, date of birth, information contained in a birth certificate or an equivalent form of identification. [¶] Someone commits an act willfully when he or she does it willingly or on purpose. [¶] An unlawful purpose includes unlawfully obtaining or attempting to obtain credit, goods, services or real property without the consent of the other person. [¶] It is not necessary that anyone actually be defrauded or actually suffer a financial, legal, or property loss as a result of the defendant's acts."

Shortly after deliberations commenced, the jury submitted a question asking if the defendant had to "be aware that Alexander [B.] is a real person [in order] to constitute unauthorized use of personal identifying information." The court responded by referring the jury to CALCRIM No. 2040. The jury submitted a follow-up question asking to see section 530.5(a) and was again directed to the CALCRIM instruction. About an hour later, the jury asked

11

whether it is "relevant that the defendant KNOWS the personal identifying information belongs to a real person," and requested a yes or no answer. The court responded that the question could not be answered that way and requested the jury "re-refer" to the instructions. The following day, the jury asked for a readback of Zgurski's trial testimony. After deliberating for about a day and a half, the jury returned their verdicts. Zgurski was found guilty of misusing personal information but not guilty of the two grand theft charges.

Zgurski was sentenced on December 14, 2018. The trial court reduced Zgurski's conviction to a misdemeanor pursuant to section 17, subdivision (b), suspended imposition of sentence, and placed Zgurski on three years' probation. On December 21, Zgurski filed his notice of appeal.

In or around April 2021, Zgurski filed a trial court motion to modify the terms of his probation. At an April 29 hearing, defense counsel stated that Zgurski was seeking "early termination and deeming of the hours." He requested that the court reduce the number of community services hours Zgurski was required to perform from 320 to 215, and that the probation period be reduced from three years to two years pursuant to Assembly Bill 1950. The motion was granted after defense counsel represented to the court that the People did not oppose it.

## DISCUSSION

### I. The Trial Evidence Supports the Verdict

Zgurski contends the trial evidence does not support his conviction for violating section 530.5(a). "The role of an appellate court in reviewing the sufficiency of the evidence is limited. The court must 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact

12

could find the defendant guilty beyond a reasonable doubt.' " (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.) " 'We presume " 'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] This standard applies whether direct or circumstantial evidence is involved." ' " (*People v. Thompson* (2010) 49 Cal.4th 79, 113.)

Section 530.5(a) provides: "Every person who willfully obtains personal identifying information, as defined in subdivision (b) of Section 530.55, of another person, and uses that information for any unlawful purpose . . . is guilty of a public offense . . . ." (§ 530.5(a).) As used in section 530.5(a), the word " 'person' " means a "natural person, living or deceased," as well as a legal business entity. (§ 530.55, subd. (a).) " '[P]ersonal identifying information' " includes "any name, address, telephone number" as well as a "state or federal driver's license, or identification number." (§ 530.55, subd. (b).)

The elements of this offense are: "(1) that the person willfully obtain personal identifying information belonging to someone else; (2) that the person use that information for any unlawful purpose; and (3) that the person who uses the personal identifying information do so without the consent of the person whose personal identifying information is being used.' " (*People v. Bollaert* (2016) 248 Cal.App.4th 699, 708–709.)

We conclude that the trial record summarized above contains substantial evidence establishing each of these elements. Pent's investigation connected Zgurski to the Eisenberg boat fraud, which Zgurski facilitated by opening the GV National account and using it to transfer money to Russia. Zgurski admitted that he wanted to make some money, so he obtained (from Klimasheuski) personal identifying information that did

13

not belong to him, and he used that information to open the account and transfer the stolen money to Russia.

The record also shows that Zgurski did not have consent to use other peoples' personal identifying information to open the GV National account. Alexander B. testified that he does not know Zgurski, and he did not give Zgurski or anybody else permission to use his name to open the account. Also, Zgurski admitted that he does not know Alexander B., or the person whose driver's license number he used, or the owner(s) of the phone numbers that he used to open the GV National account. These admissions are additional evidence that Zgurski used personal identifying information without the consent of the persons whose information he used.

On appeal, Zgurski does not address the elements of a section 530.5(a) offense that we outline above. Instead, he contends: (1) section 530.5(a) requires the prosecution to prove that the defendant knew that the personal identifying information he or she used belonged to a real person; and (2) this alleged element has not been proven by substantial evidence.

The first part of Zgurski's argument presents a question of statutory construction. "We begin with the plain language of the statute, then look to the statute's purpose, legislative history, public policy, and statutory scheme to ' " ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " ' " (*People v. Weir* (2019) 33 Cal.App.5th 868, 871 (*Weir*).)

The plain language of section 530.5(a) requires the use of personal identifying information belonging to "another person" (*id.*), and the statutory definition of a " 'person' " establishes that the other person must be real

14

(§ 530.55, subd. (a)).  But section 530.5(a) does not state or imply that the defendant must affirmatively know that his victim is a real person. Disputing this fact, Zgurski argues that the word "willfully" in section 530.5(a) is synonymous with the word "knowingly," and, therefore, the defendant must know that the personal identifying information he misused belonged to a real person.

Our Legislature has found that "[t]he word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to.  It does not require any intent to violate law, or to injure another, or to acquire any advantage."  (§ 7, subd. (1).)  Thus, our Supreme Court has held that the " 'terms "willful" or "willfully," when applied in a penal statute, require only that the illegal act or omission occur "intentionally," without regard to motive or ignorance of the act's prohibited character.' [Citations.]  'Willfully implies no evil intent; " 'it implies that the person knows what he is doing, intends to do what he is doing and is a free agent.' " ' "  (*People v. Atkins* (2001) 25 Cal.4th 76, 85.)  Moreover, "the word 'willfully' in a penal statute usually defines a general criminal intent, absent other statutory language that requires 'an intent to do a further act or achieve a future consequence.' " (*Ibid*.)

Consistent with this governing authority, courts construing section 530.5 have concluded that the word "willfully" in section 530.5 connotes only a purpose or willingness to commit an act.  (*In re Rolando S.* (2011) 197 Cal.App.4th 936, 941 [defendant willfully obtained another person's password that he retained after it was sent to him in an unsolicited text message].)  In other words, the defendant's conduct must be intentional, not accidental.  The defendant must know what he or she is doing in the sense that his or her

15

actions must be volitional. (*People v. Lee* (2017) 11 Cal.App.5th 344, 356 [use of the word "willfully" implies " 'no evil intent but means the person knows what he or she is doing, intends to do it and is a free agent' "].) But we reject Zgurski's contention that the use of the word "willfully" in section 530.5 requires affirmative proof that the defendant knew that the personal identifying information he or she willingly obtained and willingly used belonged to a real person.

Nor are we persuaded by Zgurski's contention that his interpretation of section 530.5(a) furthers its legislative purpose. "[T]he purpose of section 530.5, subdivision (a) is to criminalize the willful use of another's personal identifying information, regardless of whether the user intends to defraud and regardless of whether any actual harm or loss is caused." (*People v. Johnson* (2012) 209 Cal.App.4th 800, 818 (*Johnson*).) Importantly, this offense is distinguished from theft offenses because it involves a distinct victim and a distinct goal, as it "protects the person whose information was obtained rather than the person whose property was taken." (*Weir, supra,* 33 Cal.App.5th at pp. 875–876, italics omitted; see also *People v. Jimenez* (2020) 9 Cal.5th 53, 64–65 (*Jimenez*).)

Grafting a knowledge requirement onto section 530.5 would impede its purpose by limiting the protective reach of this law. After all, a person whose personal identifying information has been used for an unlawful purpose suffers harm whether or not the prosecutor can garner affirmative proof that the defendant knew that his or her victim was a real person. In enacting section 530.5 to remedy this harm, " 'the Legislature rationally appears to have concluded that willfulness, when coupled with use for an unlawful purpose, provides a sufficient mens rea for the offense.' " (*Johnson, supra,* 209 Cal.App.4th at p. 818; see also *Jimenez, supra,* 9 Cal.5th at p. 63

16

[" 'gravamen of the . . . offense is the unlawful use of a victim's identity' "].)
" 'The judiciary ordinarily has no power to insert in a statute an element the Legislature has omitted [citation]'" [citation]; where, as here, the statute has an appropriate mens rea requirement, "no reason appears . . . to warrant departure from this rule." ' " (*Johnson*, at p. 63.)

Zgurski purports to rely on the legislative history of section 530.5, contending that the Legislature repeatedly expressed its intent to proscribe the "*willful* use of personal information of another person." But, as we have discussed, Zgurski misperceives the meaning of the word willful. Tellingly, Zgurski does not cite any evidence in the legislative history supportive of his notion that the Legislature intended to punish only those defendants who affirmatively knew they were using the identity of a real person. Zgurski contends that the legislative history reveals a legislative purpose "to protect those individuals whose identity has been stolen," without acknowledging that this purpose is hindered, not advanced, by interposing the knowledge requirement for which he advocates.

Zgurski also relies on cases construing other statutes, but these do not alter our conclusion. *In re A.L.* (2019) 38 Cal.App.5th 15 was an appeal in a wardship proceeding where the minor was found to have violated three laws by resisting uniformed officers who broke up a fight between the minor and her sister: section 243, subdivision (b) (battery on a peace officer); section 69 (resisting a peace officer by force); and section 148, subdivision (a)(1) (section 148(a)(1)) (resisting a peace officer). The first two statutes contain express knowledge requirements, while section 148(a)(1) applies to "[e]very person who willfully resists, delays, or obstructs" an officer "in the discharge or attempt to discharge any duty of his or her office or employment." Reasoning that "[w]illfully is most naturally read as synonymous with knowingly," the

*A.L.* court construed section 148(a)(1) as requiring "that a defendant have actual knowledge he or she is resisting an officer in the performance of duty." (*A.L.*, at p. 22.)

*A.L.* has been criticized for relying on cases that do not support its construction of "willfully" and for failing to apply rules of statutory construction refuting that section 148(a)(1) requires actual knowledge (see *People v. Mackreth* (2020) 58 Cal.App.5th 317, 333–334), but we need not resolve that dispute. It is enough to note that *A.L.* involved a materially different crime, and we decline to adopt its reasoning when interpreting section 530.5(a).

Zgurski also relies on *People v. Davis* (2005) 126 Cal.App.4th 1416, in which the defendant was convicted of failing to report abuse, or suspected abuse, of a dependent adult. Affirming the judgment on appeal, the *Davis* court construed a statute differentiating between failure to report abuse and willful failure to do so. (*Id.* at pp. 1435–1436.) In that context, the court observed that when a criminal statute penalizes the "failure to perform a legally imposed duty," the use of the word "willful" to describe the intent element of the crime "denotes a requirement of proof that the defendant knew of his duty to act." (*Id.* at p. 1436.) The logic behind this principle is that "a failure to act cannot be intentional or purposeful unless the defendant knew he was under a duty to act." (*Ibid.*) This principle has no application here, where Zgurski was not penalized for failing to perform a legally imposed duty.

Finally, Zgurski relies on *Flores-Figueroa v. U.S.* (2009) 556 U.S. 646 (*Flores-Figueroa*), which involved a federal identity theft statute. In that case, the defendant presented his employer with counterfeit social security and alien registration cards that contained his real name along with

identification numbers that belonged to other people.  He was convicted of several immigration-related offenses, including aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1).  (*Id*. at p. 649.)  That statute provides for an enhanced prison sentence when, during the commission of a predicate crime, the defendant " 'knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person.' " (*Flores-Figueroa*, at p. 648, quoting 18 U.S.C. § 1028A(a)(1).)

The *Flores-Figueroa* defendant challenged his identity theft conviction on the ground that he did not know that the identification numbers that appeared on his identification cards belonged to real people.  (*Flores-Figueroa, supra*, 556 U.S. at p. 649.)  The Government argued no such proof was required because " 'knowingly' " in the statute did not modify " 'another person.' " (*Id*. at p. 650.)  The Supreme Court disagreed, holding that the statute "requires the Government to show that the defendant knew that the means of identification" that he or she unlawfully used, in fact, "belonged to another person." (*Id*. at p. 657.)  The Court based its conclusion on "ordinary English grammar," reasoning that "where a transitive verb has an object, listeners in most contexts assume that an adverb (such as knowingly) that modifies the transitive verb tells the listener how the subject performed the entire action, including the object as set forth in the sentence." (*Id*. at p. 650.)  The Court acknowledged the difficulties of proof attendant to the statute's knowledge requirement (*id*. at pp. 654–655), but concluded that "concerns about practical enforceability are insufficient to outweigh the clarity of the text." (*Id*. at p. 656.)

In contrast to the federal identity theft statute, section 530.5 does not contain the word "knowingly" or any other language clearly imposing a requirement that the defendant must know he or she victimized a real

19

person.  Unlike "knowingly," the word "willfully" in section 530.5(a) implies "a purpose or willingness to commit the act," not knowledge of its wrongfulness or intent to injure a real person.  (See § 7, subd. (1).)  It is not the language of section 530.5(a) but a separate section of the code that imposes the requirement that the personal identifying information belong to a real person.  (See § 530.55(a).)

In sum, Zgurski is mistaken that the prosecution must prove, not only that the personal identifying information belonged to a real person, but that the defendant *knew* the information belonged to a real person.  Because Zgurski's interpretation of section 530.5(a) is erroneous, his first claim of error fails, whether or not he knew Alexander B. was a real person.

Zgurski also makes the separate claim there is no evidence that the Alexander B. who testified at trial is the person whose name Zgurski used to open the GV National account.  Contending that his conviction cannot be affirmed without evidence connecting him to this particular Alexander B., Zgurski reasons that many people could have that name, and he could have obtained consent to use the personal identifying information of some other Alexander B.

We reject this alternative argument because there is substantial evidence that the Alexander B. who testified at trial is the man whose personal information Zgurski used.  Inspector Pent located this particular witness because he was connected to an FBI investigation of another fraud scheme involving Klimasheuski, the man who Zgurski admits told him to open the GV National account in Alexander B.'s name.  Klimasheuski's connection to this particular Alexander B. supports an inference that he is the Alexander B. whose identity was used without his consent in the present case.

20

Furthermore, when Pent interviewed Zgurski, she told him that Alexander B. is a real person who was angry that Zgurski used his name. In response to this information, Zgurski did not claim that he had used the name of a different Alexander B. or that he thought that the name he used was fictitious. Instead, he acknowledged that he does not actually know the person whose name he used to open the account. Zgurski changed his story at trial, claiming that Klimasheuski told him that Alexander B. was a made-up name. This material change in Zgurski's story is evidence from which the jury could have concluded that Zgurski's trial testimony was untrue. In conducting our substantial evidence review, we "must be ever cognizant that ' " it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends . . . ." ' " (*People v. Barnes* (1986) 42 Cal.3d 284, 303.)

Finally, when Alexander B. testified at trial, the prosecutor asked whether he had suffered any consequences as a result of the fact that his identity was used by Zgurski to open the GV National account. Alexander B. responded that the State of California attempted to collect back taxes from him for the 2013–2014 tax period because of the "business that was opened in my name." As the defense elected not to cross-examine Alexander B. about any matter, his undisputed testimony is additional evidence that he is the man whose personal identifying information was used to open the GV National account. We thus conclude that substantial evidence supports Zgurski's conviction.

## II.  Modification of the Probation Term Is Not Required

As noted, the trial court reduced Zgurski's felony conviction to a misdemeanor and sentenced him to three years' probation. In this court, the parties agree that Zgurski is entitled to the benefit of a 2021 amendment to

section 1203a, which generally limits the maximum probation term for a misdemeanor conviction to one year.  (Stats. 2020, ch. 328, § 2, eff. Jan. 1, 2021; see e.g. *People v. Quinn* (2021) 59 Cal.App.5th 874, 883.)  However, the parties appear to disagree about whether a remand is required so that the trial court can rule on the matter.  We need not decide because on April 29, 2021, the trial court granted Zgurski's motion to reduce his probation term to two years and to terminate it.  Since Zgurski has completed his sentence, he concedes in his reply brief that the part of his appeal challenging the length of his probation term is now moot.  (*People v. DeLeon* (2017) 3 Cal.5th 640, 645.)

By contrast, Zgurski's claim that his conviction is invalid is not mooted by the fact that he has completed his sentence.  (*People v. DeLong* (2002) 101 Cal.App.4th 482, 487 [defendant's interest in "clearing his name" permits review even after sentence has been served, italics omitted].)  We reject that claim because Zgurski's conviction for violating section 530.5(a) is supported by substantial evidence.

## DISPOSITION

The judgment is affirmed.


TUCHER, P.J.


WE CONCUR:

FUJISAKI, J.
PETROU, J.


*People v. Zgurski* (A160525)

22

Trial Court:       City and County of San Francisco Superior Court

Trial Judge:       Hon. Linda Colfax

Counsel:           Gene D. Vorobyov, by appointment of the Court of Appeal
                       for Defendant and Appellant

                   Rob Bonta, Attorney General of California, Lance E.
                       Winters, Chief Assistant Attorney General, Jeffrey M.
                       Laurence, Senior Assistant Attorney General, Donna
                       M. Provenzano, Supervising Deputy Attorney General,
                       David H. Rose, Deputy Attorney General for Plaintiff
                       and Respondent

*People v. Zgurski* (A160525)